#24012, #24025-a-DG

**2007 SD 88**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

DARREL R. VEITH,                                    Plaintiff and Appellant,

  v.

PETER O'BRIEN, M.D. and
SIOUX VALLEY CLINIC CORPORATION
d/b/a SURGICAL ASSOCIATES,                   Defendants and Appellees.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE STUART L. TIEDE
Judge

\* \* \* \*

RONALD A. PARSONS, JR.
STEVEN M. JOHNSON
KIMBERLY J. LANHAM of
Johnson, Heiderpriem, Janklow,
 Abdallah & Johnson, LLC
Sioux Falls, South Dakota                 Attorneys for plaintiff
                                          and appellant.


EDWIN E. EVANS
MELISSA C. HINTON of
Davenport, Evans, Hurwitz & Smith, LLP
Sioux Falls, South Dakota                 Attorneys for defendants
                                          and appellees.

\* \* \* \*

ARGUED MARCH 20, 2007

OPINION FILED **08/15/07**

GILBERTSON, Chief Justice

[¶1.]     On December 31, 2003, Darrell Veith (Veith) filed a complaint against Peter O'Brien, M.D. (Dr. O'Brien) and Sioux Valley Clinic Corporation d/b/a Surgical Associates (Sioux Valley Clinic) with the South Dakota Second Judicial Circuit. Veith's complaint alleged claims of medical negligence and respondeat superior. On September 28, 2004, Veith amended his complaint, adding a claim for failure to obtain informed consent. A jury trial was held from November 29, 2005 through December 6, 2005. The jury delivered a verdict in favor of Dr. O'Brien and Sioux Valley Clinic that was entered on December 8, 2005. We affirm.

## FACTS AND PROCEDURE

[¶2.]     Forty-nine-year old Veith struggled with obesity most of his adult life. By 2000, his weight was approaching 350 pounds and was causing him serious medical problems. In addition to limited mobility, Veith had a serious diabetic condition and arthritic knees. After numerous conventional weight loss attempts without success, Veith's family physician, Dr. Michael Farritor, recommended gastric bypass surgery.

[¶3.]     Veith researched the many available types of gastric bypass surgery. He eventually decided upon a procedure called Roux-en-Y.[1] Veith initially

---

1.     Roux-en-Y gastric bypass is one of the most frequently performed weight loss procedures in the United States. The procedure is performed by creating a small pouch from the upper portion of the stomach. The remainder of the stomach is not removed, but is divided from the newly formed pouch and stapled shut. The small intestine is then divided below the duodenum. The lower portion of the small intestine is brought up and attached to the newly formed pouch. The duodenum is then reattached at a lower point on the small intestine creating a "Y" from which the procedure obtains its name.

(continued . . .)

consulted with Dr. Fred Harris.  Dr. Harris, a bariatric surgeon, regularly performed the Roux-en-Y procedure.  During the consultation, Dr. Harris gave Veith a booklet published by the American Society for Bariatric Surgery (ASBS) entitled, *"Surgery for Morbid Obesity: What Patients Should Know."*  The booklet explained the various types of gastric bypass procedures, including the Roux-en-Y, as well as the potential complications involved with gastric bypass.  Dr. Harris discussed the surgery and potential complications with Veith, but was unable to perform the surgery because his schedule was full for the foreseeable future.  Consequently, Dr. Harris referred Veith to Sioux Valley Clinic.

[¶4.]     Veith scheduled an appointment with Dr. Donald Graham (Dr. Graham) at Sioux Valley Clinic.  However, on July 25, 2001 when he went to Sioux Valley Clinic for the appointment, Veith instead met with Dr. O'Brien.  Again the various risks and complications of gastric bypass were discussed with Veith.  Dr. O'Brien also discussed the general ways in which gastric bypass can be accomplished, through a full-open procedure or laparoscopic surgery.  Dr. O'Brien explained that the less invasive laparoscopic surgery, in comparison to a full-open procedure that lays open the entire abdomen exposing the bowel, is conducted by making several small incisions in the abdomen through which the surgeon inserts instruments.  Through one of the incisions the surgeon inserts a laparoscope, a tube

_____

(. . . continued)
  http://www.stronghealth.com/services/surgical/bariatric/rouxeny.cfm (last
  visited July 17, 2007);
  http://www.stronghealth.com/services/surgical/bariatric/roux-en-y-image.html
  (last visited July 17, 2007).

with a light and a camera that enables the surgeon to conduct the procedure by viewing a video monitor.

[¶5.] The gastric bypass procedure performed by Dr. O'Brien is referred to as the "loop gastric bypass," otherwise referred to as the "mini gastric bypass" or "mini-loop gastric bypass."[2] Veith was again provided a copy of the same ASBS booklet he had received during the consultation with Dr. Harris. The ASBS booklet did not describe the loop gastric bypass. Although disputed by Veith, evidence was introduced at trial that Veith also received a second booklet, describing the loop gastric bypass, entitled, "*Laparoscopic Gastric Bypass Performed by Dr. Peter J. O'Brien.*"[3] Dr. O'Brien testified that following his explanation of the loop gastric bypass, he recommended to Veith that he loose 20 pounds so as to ensure that the loop gastric bypass could be performed laparoscopically as opposed to a fully invasive open procedure. Following the initial consultation, Dr. O'Brien sent Veith

---

2.    Dr. O'Brien testified at trial that the loop gastric bypass is simpler than the Roux-en-Y procedure. Dr. O'Brien stated that the loop procedure, like the Roux-en-Y, involves an initial dividing of the stomach in order to form a small pouch. However, unlike the Roux-en-Y, the small intestine is not divided. The newly formed pouch is merely attached to the small intestine at a point below the duodenum.

3.    Dr. O'Brien testified that at the initial consultation that all patients have a copy of both the ASBS booklet and the booklet describing the loop gastric bypass. Dr. O'Brien stated that he goes through both booklets with each patient explaining the loop gastric bypass as compared to the procedures described in the ASBS booklet, including the Roux-en-Y. Pam Kludt, Dr. O'Brien's intake nurse, who brought Veith to the examination room prior to his consultation with Dr. O'Brien, offered testimony corroborating Dr. O'Brien's testimony as to his consultation practice and that Veith would have had both booklets during the consultation.

a letter confirming that he was scheduled for laparoscopic loop gastric bypass surgery. Veith acknowledged at trial receiving and reading the letter.

[¶6.] The day prior to the surgery, Veith again met with Dr. O'Brien. During the pre-operative appointment, Dr. O'Brien again discussed the upcoming surgery and the potential complications. While there, Veith signed a consent form indicating that he understood the nature and purpose of the operation, possible alternative methods of treatment, the potential benefits and risks, and the likelihood of success and post-operative complications. Veith was aware that among the various complications that could arise from gastric bypass surgery, one could experience a leak anywhere in the bowel where there had been a division or where two parts had been joined together. He was aware that such a leak could cause abscesses or even peritonitis that could lead to death. Veith was also aware that among the potential complications he also risked hematoma or intra-abdominal bleeding, bowel obstructions, pneumonia and ulcers. Moreover, he was aware that potential revision surgery might be necessary.

[¶7.] On November 13, 2001, Dr. O'Brien performed loop gastric bypass surgery on Veith. Despite the fact that Veith had not lost 20 pounds prior to surgery, Dr. O'Brien went ahead with the laparoscopic procedure because Veith was tall and, at 328 pounds, still within the 350 pound limit to which he restricted the performance of laparoscopic surgery. Dr. O'Brien anticipated that Veith would be hospitalized for about two days following surgery. However, Veith developed post-surgical complications and remained at Sioux Valley Hospital for nine days.

[¶8.] While hospitalized, Veith developed a large abdominal hematoma and experienced severe pain. Veith also developed pneumonia, a fever and an elevated

white blood count. Concerned that the hematoma might be infected Dr. O'Brien ordered a CT scan.[4] He subsequently ordered a regime of antibiotic treatment which resolved these issues. Veith was soon able to take in a full liquid diet and was discharged on November 22, 2001.[5]

[¶9.]     Within a few weeks, Veith's condition worsened. On December 19, 2001, he was readmitted to Sioux Valley Hospital after he was diagnosed with an intra-abdominal abscess, resulting from a leak that had developed in the reconstructed digestive track sometime following surgery.[6] Dr. O'Brien inserted a

---

4.   It is undisputed that a CT scan alone will not detect a leak in the digestive system. Part of the basis for Veith's negligence claim is that Dr. O'Brien failed to provide the requisite standard of care by not, at this time, ordering a CT scan with oral contrast that can detect such a leak. Dr. O'Brien testified that he did not order the oral contrast because, at the time, he did not suspect a leak. Dr. O'Brien reasoned that both hematoma and pneumonia caused fever and elevated white blood counts. However, the determinative factor to Dr. O'Brien that no leak existed was the fact that Veith was not experiencing the "hallmark symptom of a leak," an elevated pulse rate of 120 or more.

5.   Dr. O'Brien's patient notes, included in Plaintiff's Exhibit 1(b), reflect Veith's post-operative improvement prior to the November 22, 2001 discharge. Dr. O'Brien pointed to this improvement and Veith's ability to take in a full liquid diet as evidence that he was not suffering from any digestive system leak when discharged.

6.   Though the time at which the leak developed has never been determined with specificity, the parties do not dispute that it occurred post operation. Nevertheless, part of the basis for Veith's negligence claim is that Dr. O'Brien failed to provide a requisite standard of care by not, performing an intra-operative leak test before the end of the surgical procedure. This test is conducted after the digestive track has been reassembled, and is conducted by injecting a quantity of air or saline solution into the bowel and watching for bubbles in the areas of reconstruction. Dr. O'Brien testified that the procedure was similar to looking for leaks in a tire. Dr. O'Brien submitted that he had discontinued conducting the intra-operative leak tests when after performing in excess of 100 loop gastric bypasses using the laparoscopic

(continued . . .)

drain in Veith's side and established nutritional support through an IV tube. Dr. O'Brien also prescribed antibiotics to fight the infection. At Veith's request, Dr. O'Brien transferred him to the Mayo Clinic. Veith received the same type of treatment at Mayo. After staying there approximately two weeks, he was discharged. Veith ultimately recovered from the leak and resultant abscess.

[¶10.]		During the next eighteen months, Veith developed an ulcer which eventually healed with medication. However, he also had difficulty maintaining his weight which eventually dropped to about 150 pounds. On June 10, 2003, Veith consulted with Dr. O'Brien's partner Dr. Graham. On October 1, 2003, Dr. Graham performed revision surgery and reconfigured Veith's bowel from the loop gastric bypass, performed by Dr. O'Brien, to the Roux-en-Y configuration. During the surgery Dr. Graham discovered and repaired a twist that had developed in Veith's bowel, which was causing a partial blockage that accounted for his inability to maintain weight.[7]

[¶11.]		On December 31, 2003, Veith filed his complaint against Dr. O'Brien and Sioux Valley Clinic alleging medical negligence and respondeat superior. Veith amended his complaint on September 28, 2004, to include a claim for failure to obtain informed consent. A jury trial commenced on November 28, 2005.

---

(. . . continued)
	procedure he had never found a leak. He reasoned that the additional time under anesthesia and expense for the patient was not warranted given the absence any leaks discovered during prior leak tests.

7.	Dr. Graham testified at trial that such twists can occur many years after gastric bypass surgery, including the Roux-en-Y procedure.

[¶12.]     Prior to trial, Veith was granted a motion in limine to exclude certain evidence related to Dr. O'Brien's track record with the loop gastric bypass procedure. The subsequent order permitted Dr. O'Brien to testify as to the probability of success using the loop gastric bypass, based on his expert knowledge and to testify as to his personal knowledge of the number of patients upon whom he operated that developed complications. However, he was not permitted to testify or introduce evidence "as to any error rate or leak rate in terms of percentages, decimals, etc."

[¶13.]     During Veith's case-in-chief, and over defense counsel's objection noting the trial court's prior order, plaintiff's counsel cross-examined Dr. O'Brien about the national complication rate for gastric bypass surgery rate in terms of percentages. On redirect and over Veith's objection, the trial court allowed Dr. O'Brien to give testimony as to the percentage of operations that he had performed from which various types of complications had arisen as compared to the national percentage rates for the same complications. Dr. O'Brien's testimony indicated that his surgical complication rate compared favorably with the national rate.

[¶14.]     Veith called bariatric surgeon James M. Balliro, M.D. (Dr. Balliro) to give expert testimony. Dr. Balliro testified that the loop gastric bypass that Dr. O'Brien performed on Veith had two major problems that he claimed made the procedure unacceptable. First, the manner and location in which the newly created small pouch was attached to the small intestine caused acid, bile and pancreatic digestive enzymes to reflux back into the stomach when eating, causing pain, bleeding, irritation and ulcers. Second, if a leak developed in the stomach due to the problems caused by the constant refluxing, the material in the stomach that

leaked out into the abdominal cavity was particularly noxious. Consequently, Dr. Balliro testified that a standard of care was violated simply by performing the loop gastric bypass,[8] despite being unable to reference any recognized medical journal, organization or society that had adopted this position. During cross-examination, Dr. Balliro was asked whether he believed that a hospital, like Sioux Valley Hospital where Veith's procedure was performed, violates a standard of care by permitting loop gastric bypass surgery to be conducted on premises. Veith objected to the question as prejudicial, because Sioux Valley Hospital was not a party to the suit.[9] The trial court overruled the objection allowing the question, wherein Dr. Balliro replied in the affirmative. The trial court did however, invite Veith to propose a curative instruction if he felt it appropriate. Accordingly, the settled jury instructions included a clarification that Sioux Valley Hospital was not a party to the action and that Veith was not making a claim against Sioux Valley Hospital.

[¶15.] In support of his informed consent claim and in response to Dr. O'Brien's testimony that all patients receive and are instructed about the contents of his booklet—describing the loop gastric bypass surgery that he performs—Veith offered the testimony of Laura Hunnington (Hunnington). Hunnington was a friend of Veith's and had also been a patient of Dr. O'Brien's before moving from Parker,

---

8.   Dr. Balliro also alleged Dr. O'Brien violated standards of care by not performing an intra-operative leak test before concluding surgery, for not properly diagnosing Veith's post-operative leak, and for not obtaining Veith's informed consent before performing loop gastric bypass surgery.

9.   Defense counsel submits that Sioux Valley Clinic and Sioux Valley Hospital are separate 501(c)(3) non-profit corporations.

South Dakota to Kerman, California, where she resided at the time of trial.

Subsequent to Veith filing his complaint, Hunnington also retained Veith's counsel, filed her own complaint against Dr. O'Brien and, like Veith, alleged claims of medical negligence and failure to obtain informed consent. Over Dr. O'Brien's objection, Hunnington was allowed to testify as to her contention that she, like Veith, never received Dr. O'Brien's booklet.[10]

[¶16.] Prior to trial Dr. O'Brien was granted a motion in limine prohibiting the parties from inquiring into other lawsuits against him. At trial, during a bench conference following Dr. O'Brien's objection to Hunnington's testimony, plaintiff's counsel stated to the trial court, "If they want to withdraw the motion to try to impeach her with the fact the she's got a lawsuit, let them have at it." Accordingly, without objection from Veith, nor further direction from the trial court, defense counsel cross-examined on Hunnington's lawsuit against Dr. O'Brien in order to establish bias.

[¶17.] During the spring of 2003, Veith saw a gastroenterologist, Jorge Gilbert, M.D. (Dr. Gilbert), about recurrent stomach pain. As Veith's treating physician, Dr. O'Brien called Dr. Gilbert to testify at trial as to his diagnosis. Dr. Gilbert performed an upper endoscopy examination on Veith.[11] The examination

---

10. Dr. O'Brien objected to Hunnington's testimony on the ground that it was extrinsic evidence offered to contradict Dr. O'Brien's testimony on a collateral matter and as such inadmissible under SDCL 19-14-10 (Rule 608(b)).

11. Dr. Gilbert described the upper endoscopy as a procedure in which a small flexible scope with a camera is introduced into the patient's upper gastrointestinal tract.

revealed that Veith had a large anastomatic ulcer[12] near the point where the newly formed stomach pouch was reattached to small intestine. Dr. Gilbert believed it was likely that Veith's ulcer was caused by the disruption of the inner lining of Veith's digestive track, as a result of surgery, and the presence of aspirin in his system. Accordingly, Dr. Gilbert recommended that Veith discontinue taking aspirin. He also prescribed what he called "the standard care for a patient with ulcers," Prevacid, a proton pump inhibitor that shuts down the production of hydrochloric acid in the stomach.

[¶18.] When defense counsel asked Dr. Gilbert whether he diagnosed Veith with bile reflux and whether that was a contributing factor to the ulcer, plaintiff's counsel objected arguing that Dr. Gilbert was an undisclosed expert witness giving testimony as to a matter that had not been mentioned in his patient notes. Dr. Gilbert was permitted to answer the question over the objection. He indicated that Veith had not been suffering from bile reflux and that as such bile reflux was not a contributing factor to the ulcer.[13] Dr. Gilbert explained that bile reflux is a clinical syndrome characterized by the active vomiting of bile, which Veith had not experienced. Dr. Gilbert further explained that anastomotic ulcers, such as Veith's, are not produced by bile reflux.

---

12. Dr. Gilbert described anastomatic ulcer as a disorder that can be caused by a variety of factor's and "can occur up to 16, 18% of the time" following gastric bypass surgery.

13. In addition to Dr. Gilbert, plaintiff's expert David Hargroder, M.D., Dr. Graham and Dr. O'Brien all testified that Veith had not experienced post-operative bile reflux.

[¶19.]    During the settlement of jury instructions, Veith offered several objections.  He objected to Instruction No. 25 on the ground that it was legally flawed as to the issue of medical negligence.  His objection to Instruction No. 26 was essentially based on the assertion that a jury would likely construe it as applicable to the issue of informed consent and mistakenly apply it to that claim rather than his medical negligence claim as intended.  Veith also objected to Instruction No. 39 on the ground that it was a legally inaccurate statement of agency law as applied to respondeat superior in the setting where a physician is alleged not to have obtained a patient's informed consent.  In addition, Veith requested plaintiff's Instruction No. 27 to clarify that in the event the jury found Dr. O'Brien to have obtained Veith's informed consent, it could still find him liable on the negligence claim.  The trial court refused this instruction on the ground that it was unnecessarily repetitious in context with the list of settled jury instructions.

[¶20.]    During closing argument, defense counsel discussed at length the record of plaintiff's expert Dr. Balliro.  Dr. Balliro is licensed to practice medicine in Wyoming and Idaho and resides in Jackson, Wyoming.  During the trial, he testified that he had been licensed to practice medicine since 1984, and had been providing plaintiffs' expert medical services since about 1985.

[¶21.]    Defense counsel stated in closing argument that Dr. Balliro was like the Old West bounty hunter, "Paladin," from the 1960's TV series, "Have Gun, Will Travel."  Defense counsel stated that Dr. Balliro "travels from state to state" and "charges $10,000.00 per case," telling plaintiffs, "I will get your man.  Give me the check."  Defense counsel went on to point out that Dr. Balliro "got another notch on his belt" when he came to South Dakota to testify against Dr. O'Brien, noting that

South Dakota was the 26th state in which he had given plaintiff's expert testimony in a medical malpractice case. Defense counsel further commented that Dr. Balliro, as a doctor, had more experience in the courtroom than defense counsel did as an attorney.[14] [15] Defense counsel also said that although plaintiff's counsel had stated Dr. Balliro could "earn a lot more" money "if he was back doing surgery in Jackson, WY," he nevertheless went "gallivanting around the country" reviewing "30 cases a year, currently" at "$10,000.00 a case," while "Dr. O'Brien has been taking care of patients," "for some 20 years." Finally, defense counsel implied that Dr. Balliro, who "charges $2000, sometimes $2500, whatever he can get away with" for depositions, with respect to his fee for services provided to Veith, would base his fee "upon the results," since "he hasn't decided what he's going to charge yet in this case."

---

14. During his cross-examination of Dr. Balliro, defense counsel brought up a statement made by Dr. Balliro during his April 2005 testimony in an Iowa medical negligence case, arising out of a gastric bypass surgery. At that time, Dr. Balliro acknowledged that he had served as plaintiff's expert, in malpractice suits against doctors, at least 107 times through March 1, 2005.

15. At this point, plaintiff's counsel made objection and the trial court responded as follows:

[Plaintiff's Counsel]: I am going to object. Counsel is testifying about how his experience level is. That's not right.

[The Court]: Ladies and Gentlemen of the Jury, it will be up to you to decide whether or not the arguments of counsel are consistent with the evidence in this case.

Plaintiff's counsel offered no other objections during defense counsel's closing argument.

[¶22.]    The trial concluded on December 6, 2005, with the jury rendering its

verdict in favor of Dr. O'Brien and Sioux Valley Clinic.  On December 8, 2005, the

trial court entered judgment on the verdict.

[¶23.]    Veith appeals raising seven issues:

1.    Whether the trial court abused its discretion by
      admitting "track record" evidence as to Dr. O'Brien's
      experience with loop gastric bypass surgery.
2.    Whether the trial court abused its discretion by
      denying Veith's motion for a mistrial after allowing
      defense counsel to question plaintiff's expert as to
      whether a non-party had failed to provide a standard
      of care.
3.    Whether the trial court erred by allowing defense
      counsel to question plaintiff's witness about another
      lawsuit against Dr. O'Brien after the trial court
      had granted Dr. O'Brien's motion in limine prohibiting
      the parties from inquiring into or introducing evidence
      about such lawsuits.
4.    Whether the trial court abused its discretion by
      allowing Veith's treating physician to testify as to
      the nature and cause of the disorder for which Veith
      sought treatment.
5.    Whether the trial court abused its discretion by the
      inclusion of disputed jury instructions and whether
      the trial court erred by refusing a proposed instruction
      setting out two separate and distinct claims.
6.    Whether the trial court erred by allowing defense
      counsel's comments in regard to plaintiff's expert
      during closing argument.
7.    Whether the trial court abused its discretion by
      refusing to admit evidence of Veith's medical expenses
      in excess of the amount that the medical providers
      accepted as payment in full.

[¶24.]    Dr. O'Brien raises one issue on appeal by notice of review:

8.    Whether the trial court abused its discretion by
      allowing Veith to enter extrinsic evidence to refute
      Dr. O'Brien's assertion that all his patients receive
      a booklet explaining the procedure he performs.

**STANDARD OF REVIEW**

[¶25.] "The trial court's evidentiary rulings are presumed correct and will not be overturned absent a clear abuse of discretion. 'An abuse of discretion refers to a discretion exercised to an end or purpose not justified by, and clearly against reason and evidence.'" Kaiser v. University Physicians Clinic, 2006 SD 95, ¶29, 724 NW2d 186, 194 (internal citations and quotations omitted). "The denial of a motion for mistrial is reviewed under an abuse of discretion standard." State v. Janklow, 2005 SD 25, ¶42, 693 NW2d 685, 699 (citing State v. Ball, 2004 SD 9, ¶16, 675 NW2d 192, 197 (citations omitted)). We recently discussed our standard of review as to jury instructions in *Vetter v. Cam Wal Elec. Co-op., Inc.*, 2006 SD 21, 711 NW2d 612. We said that we review the wording and inclusion of individual instructions as well as the overall arrangement of the jury instructions under the abuse of discretion standard. *Vetter*, 2006 SD 21, ¶10, 711 NW2d at 614 (citations omitted). However, with respect to the correctness of the instructions taken as a whole and whether the jury was properly instructed overall, we apply the de novo standard of review. *Id.* (citations omitted).

**ANALYSIS AND DECISION**

[¶26.] **1. Whether the trial court abused its discretion by admitting "track record" evidence as to Dr. O'Brien's experience with loop gastric bypass surgery.**

[¶27.] Veith argues that Dr. O'Brien's "track record" testimony was prejudicial; allowance of which was error and an abuse of discretion in light of the trial court's previous grant of Veith's motion in limine, prohibiting Dr. O'Brien from presenting such evidence. However, when a party through his questions "opens the

door" to admission of evidence, the party may not challenge the admission of that evidence. State v. Klein, 444 NW2d 16, 19-20 (SD 1989) (citing United States v. Gipson, 862 F2d 714 (8thCir 1988)) (holding that defense counsel "opened the door" to the prosecution's questioning of the defendant about prior convictions when defense counsel asked a prosecution witness whether he was aware that the defendant was a convicted felon). Further, "[t]he doctrine of 'invited error' embodies the principle that a party will not be heard to complain on appeal of errors which he himself induced or provoked the court or the opposite party to commit. It has been held that for the doctrine of invited error to apply it is sufficient that the party who on appeal complains of the error has contributed to it." Taylor Realty Co. v. Haberling, 365 NW2d 870, 873 (SD 1985) (quoting 5 AmJur2d Appeal and Error § 713).

[¶28.]     Veith opened the door to Dr. O'Brien's track record testimony about his surgical complication rate, in terms of percentages, when he cross-examined Dr. O'Brien about national complication percentages for gastric bypass surgery. Consequently, there was no abuse of discretion in the trial court's decision to allow Dr. O'Brien's testimony. Nevertheless, assuming *arguendo* that the court erred in allowing Dr. O'Brien's testimony under the opened the door doctrine, the error began with Veith's initial questioning of Dr. O'Brien as to national complications rates. Thus, having contributed to the error and having induced the trial court and Dr. O'Brien to follow suit, Veith's claim is without merit.

[¶29.]    **2.    Whether the trial court abused its discretion by denying Veith's motion for a mistrial after allowing defense counsel to question plaintiff's expert as to whether a non-party had failed to provide a standard of care.**

[¶30.]    Dr. Balliro testified that simply performing the loop gastric bypass procedure is a *per se* violation of the standard of care. Dr. Balliro could not cite any recognized medical journal, organization or society that had adopted this position. Dr. O'Brien contends that his question, as to whether a hospital, such as Sioux Valley Hospital where Veith's surgery was performed, likewise violates a standard of care by permitting the loop procedure to be conducted on premises, was asked in order to demonstrate the extremism of Dr. Balliro's position. Veith avers that interjecting the potential liability of Sioux Valley Hospital, a non-party, into the proceedings at that juncture denied him a fair trial. He claims that he was not permitted to conduct "any" voir dire of the jury regarding Sioux Valley Hospital. Veith also claims that he "had absolutely no opportunity to assess, prevent, or counteract the prejudicial impact" of Dr. Balliro's statement that Sioux Valley Hospital might be liable. The record does not bear out Veith's assertions.

[¶31.]    Plaintiff's counsel discussed Sioux Valley Hospital several times during jury voir dire. The following exchange occurred during voir dire:

> [Plaintiff's Counsel]: Well, as luck would have it, one of the jurors who was chosen [is] an employee of *Sioux Valley, which is connected with the defendant in this case and would be automatically excluded.*
>
> . . .
>
> [Defense Counsel]: Is he an employee of Sioux Valley Clinic or Sioux Valley Hospital?

> [Plaintiff's Counsel]: Sioux Valley Hospital, I think. His form said Sioux Valley something. *Even if it's Sioux Valley Hospital, it's all connected*, so—

Plaintiff's counsel made the following statement during voir dire:

> [Plaintiff's Counsel]: . . . This is a medical negligence case brought by Mr. Darrel Veith, . . . who underwent surgery back in November of 2001. Dr. O'Brien, the defendant, who is part of the *Surgical Associates, which is part of the Sioux Valley Alliance* performed the surgery. . . .

Plaintiff's counsel asked the following question during voir dire:

> [Plaintiff's Counsel]: Have you had *any relationship with Sioux Valley or the Sioux Valley Systems at all?*
>
> [Prospective Juror]: No, not in a work way, no.

Plaintiff's counsel made the following inquiry during voir dire:

> [Plaintiff's Counsel]: You have seen a lot of ads on TV and in the newspaper by Sioux Valley soliciting patients for gastric bypass and Dr. O'Brien has been in some of those ads. . . . Anyone know anyone who has responded to those ads and requested information on gastric bypass? *Has anyone been a patient of the Sioux Valley Clinic, Sioux Valley Hospital, any affiliate of Sioux Valley?*[16]

[¶32.] Moreover, Veith's claim that he was never offered an opportunity to assess, prevent, or counteract any prejudicial impact from Dr. Balliro's suggestion

---

16. Further belying the wall that Veith attempts to construct between Sioux Valley Clinic, Sioux Valley Hospital and the other entities in the Sioux Valley group of affiliates is the name printed on Dr. O'Brien's booklet (defense Exhibit 22). Near the bottom of the cover, under the Sioux Valley logo, can be found printed the name "*Sioux Valley Hospital, USD Medical Center.*"

of hospital liability is unsupported. The trial court permitted Veith a curative jury instruction. Jury Instruction No. 31 provides in pertinent part:

> You have heard evidence that the plaintiff underwent surgery and was hospitalized at Sioux Valley Hospital. *Sioux Valley Hospital is not a party to this action. The plaintiff has made no claim against Sioux Valley Hospital* as a result of the injuries and damages he claims to have suffered in this matter.

[¶33.] Accordingly, we find no error in defense counsel's question to plaintiff's expert, Dr. Balliro, as to the potential liability of Sioux Valley Hospital. We thus conclude there was no abuse of discretion by the trial court in denying plaintiff's motion for mistrial related to that line of questioning.

[¶34.] **3. Whether the trial court erred by allowing defense counsel to question plaintiff's witness about another lawsuit against Dr. O'Brien after the trial court had granted Dr. O'Brien's motion in limine prohibiting the parties from inquiring into or introducing evidence about such lawsuits.**

[¶35.] Over defense counsel's objection, Veith offered Hunnington's testimony to refute Dr. O'Brien's testimony that all of his patients received and were instructed on the gastric bypass procedures described in both the ASBS booklet and in Dr. O'Brien's booklet. Veith now alleges that defense counsel's cross-examination of Hunnington, who traveled from California to testify for Veith, on the matter of her pending lawsuit against Dr. O'Brien for purposes of establishing bias, was error because it violated an order in limine. However, Veith did not object at trial to defense counsel's line of questioning on this matter and hence does not preserve this issue for appeal. *See* Bakker v. Irvine, 519 NW2d 41, 47 (SD 1994) (holding that a party failing to make a timely objection to evidence at trial cannot, as a matter of law, be heard to complain on appeal that its admission is error constituting an

irregularity in the proceeding); Anderson v. Johnson, 441 NW2d 675, 677 (SD 1989) (holding that the plaintiff waived his right to argue an issue on appeal by failing to object below, thereby denying the trial court the opportunity to correct its mistakes); *see also* Hepper v. Triple U Enterprises Inc., 388 NW2d 525 (SD 1986); State v. Carlson, 392 NW2d 89 (SD 1986); Johnson v. John Deere Company, 306 NW2d 231 (SD 1981); Till v. Bennett, 281 NW2d 276 (SD 1979).

[¶36.]     In addition to couching his argument in terms of an irregularity in the proceedings under SDCL 15-6-59(a)(1), Veith attempts to restate this issue on appeal by citing SDCL 19-9-3, which provides in pertinent part: "Once the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not *renew* an objection or offer of proof to preserve a claim of error for appeal." (Emphasis added). Veith, however, did not make the requisite initial objection or offer of proof to the trial court's November 17, 2005 order in limine with respect to prohibitions on the inquiry into other lawsuits involving Dr. O'Brien.[17]

[¶37.]     Simply put, there is no irregularity in the proceedings because Veith's failure to object to defense counsel's cross-examination of Hunnington, about her

---

17.     In any case, that part of SDCL 19-9-3 that Veith cites in support of his contention was not adopted until July 1, 2006 – after the trial.

pending lawsuit with Dr. O'Brien, deprived the trial court an opportunity to correct any error. Consequently, Veith failed to preserve the issue below for our review on appeal.

[¶38.]    **4.    Whether the trial court abused its discretion by allowing Veith's treating physician to testify as to the nature and cause of the disorder for which Veith sought treatment.**

[¶39.]    Veith did not object to Dr. O'Brien calling Dr. Gilbert as a treating physician to testify to the treatment that he provided Veith. However, Veith did object when Dr. Gilbert testified to a matter about which he had no record in his patient notes — bile reflux, or the lack thereof. Because there was no mention of bile reflux in Dr. Gilbert's patient notes,[18] Veith argues that Dr. Gilbert's testimony on this subject constituted expert testimony by a previously undisclosed expert and as such the trial court abused its discretion by its admittance.

[¶40.]    Previously undisclosed expert testimony to a matter about which the expert has no knowledge, but is instead based on his own perceptions has been held to be inadmissible. State v. Andrews, 2001 SD 31, ¶¶18-19, 623 NW2d 78, 83 (holding that it was error to allow a police officer, who was admitted as a lay witness after a prosecution motion to admit him as an expert was denied for lack of timeliness, to give testimony as to a matter about which he had no personal knowledge).

---

18.    During the bench conference following plaintiff's counsel's objection to the bile-reflux line of questioning, defense counsel pointed out that neither did Dr. Gilbert's patient notes include any reference to Veith having "cancer or a heart transplant."

[¶41.]     In *Kuper v. Lincoln-Union Elec. Co.*, 1996 SD 145, 557 NW2d 748, we considered the status of an expert whose opinions and knowledge were obtained through his own perceptions of the circumstances surrounding litigation, but whose opinions and knowledge were not obtained in anticipation of litigation. In *Kuper*, the plaintiff had a specialist in electricity examine his milk barn for the presence of stray voltage eight months prior to the commencement of litigation. 1996 SD 145, ¶¶11, 14, 557 NW2d at 754. Following the commencement of litigation, the defendant sought to depose the expert on his findings. *Id*. ¶14, 557 NW2d at 755. The trial court, however, did not allow the defendant to conduct the deposition concluding that the expert was a "non-testifying expert" under SDCL 15-6-26(b)(4)(B).[19] *Id*. However, since the plaintiff hired the expert prior to the commencement of litigation or any preparation thereof, we reversed the trial court, concluding that the facts did not support the finding below that the expert was a non-testifying expert, but rather that he should have been treated as *an ordinary witness*.[20] *Id*. ¶25, 557 NW2d at 757.

[¶42.]     We also observe that other courts have considered treating or examining physicians to be ordinary witnesses when their knowledge and opinions

---

19.    Under SDCL 15-6-26(b)(4)(B) (FRCP 26(b)(4)(B)), an opposing party may have discovery access, to the facts known to or opinions held by a *non-testifying expert retained in anticipation of litigation*, in only those specific circumstances referenced in the statute.

20.    In *Kuper*, we observed that the Advisory Committee notes to FRCP 26(b)(4)(B) stated that the rule is not applicable to an expert whose knowledge was not acquired in anticipation of litigation, but rather as an actor or viewer with respect to occurrences germane to the subject matter at

(continued . . .)

of patients' conditions are obtained outside the realm of litigation through their own perceptions. In *Morris-Rosdail v. Schechinger,* 576 NW2d 609 (IowaApp 1998), the court found that two doctors, one who examined the plaintiff nine months prior to the commencement of a lawsuit and a second who was actively treating the plaintiff at the time of trial, did not develop their opinions as to the plaintiff's condition in anticipation of the lawsuit or with the trial in mind and were thus treating physicians. *Id.* at 612. The court thereby held that the rule governing disclosure of experts did not apply and that the doctors' testimony as to the plaintiff's permanent impairment and need for future surgery was admissible. *Id.* In arriving at this conclusion, the court stated:

> It is important to recognize [the Iowa] rule governing the
> discovery of experts distinguishes between facts and opinions of
> experts which were derived prior to being retained as an expert
> and those acquired or developed in anticipation of litigation or
> for trial. Only those opinions and facts acquired by an expert
> in anticipation of litigation or for trial are subject to discovery
> under our rule. The rule does not preclude an expert from
> testifying to facts and opinions derived prior to being retained
> as an expert. Thus, the testimony of a treating physician is
> generally not subject to . . . discovery procedures[.]

*Id.* at 611-12 (internal citations omitted). *See also* Day by Ostby v. McIlrath, 469 NW2d 676, 677 (Iowa 1991) (holding testimony of a treating physician is not subject to discovery procedures under the Iowa rule governing discovery of experts, because the treating physician's mental impressions and opinions were not "acquired or developed in anticipation of litigation or for trial"); Rogers v. Detroit Edison Co., 328

---

(. . . continued)
      issue and that such experts should be treated as *ordinary witnesses.* 1996 SD
      145, ¶25, n6, 557 NW2d 748, 757, n6.

FSupp2d 687, 690 (ED Mich 2004) (holding, in a personal injury action where the plaintiff proffered a psychologist's trial testimony would be limited to the nature, cause, and treatment of the plaintiff's psychological injury resulting from the accident, that under the federal rule of civil procedure governing pretrial disclosure for expert witnesses, the plaintiff was not required to file a written expert report prepared by the plaintiff's treating psychologist).

[¶43.]     In the instant case Veith came to Dr. Gilbert in March 2003, suffering from stomach pain.  Dr. Gilbert diagnosed the source of Veith's discomfort as an anastomatic ulcer near the point of attachment of Veith's new stomach pouch with his small intestine.  Prior to the commencement of litigation on December 31, 2003, Dr. Gilbert treated Veith with success over the course of several months during the spring and summer of 2003.

[¶44.]     Dr. Gilbert's course of treatment required him to make a determination as to the cause of the ulcer.  He was able to rule out bile reflux as a cause of the ulcer since he found no evidence that Veith was suffering from this disorder.  However, he determined that a combination of factors including the ordinary post-surgical irritation of the inner wall of the digestive track, coupled with the stomach's production of hydrochloric acid and Veith's use of aspirin, likely caused the ulcer.  Accordingly, Dr. Gilbert prescribed Prevacid and the suspension of aspirin.

[¶45.]     Although, as a gastroenterologist, Dr. Gilbert would be considered a medical expert in the field of gastroenterology, we find nothing in the record to support nor does Veith claim that he was ever retained for that purpose.  To the contrary, it is apparent that Veith's only purpose in seeing Dr. Gilbert was in hopes

of obtaining relief from the stomach pain that was afflicting him. It is true that Dr. Gilbert's diagnosis of Veith's condition that included his determination that Veith was not suffering from bile reflux disorder may have diminished the impact of Dr. Balliro's claim that the mere performance of loop gastric bypass surgery was violative of a standard of care in part because it results in bile reflux.[21] However, Dr. Gilbert's testimony, like that of an ordinary witness, was based on his perceptions. His perceptions were obtained while attempting to ascertain the nature and cause of what ailed Veith and the appropriate course of treatment. Accordingly, we conclude there was no abuse of discretion in allowing Dr. Gilbert to testify to the absence of bile reflux.

[¶46.]  **5.  Whether the trial court abused its discretion by the inclusion of disputed jury instructions and whether the trial court erred by refusing a proposed instruction setting out two separate and distinct claims.**

[¶47.]  Veith argues that he was deprived a fair trial due to the inclusion of legally erroneous jury instructions.

*Instruction No. 25*

> In determining whether a defendant was negligent in selection of a method of treatment, you should *consider the judgment in light of all the attendant circumstances at the time he acted.* In view of all the facts and the state of knowledge of the profession at the time the defendant acted, *the proper test is whether the treatment employed was in conformity with the accepted standards of skill*

---

21.  While not determinative on this issue, it is also possible that the impact of Dr. Balliro's claim was diminished by the testimony of three other medical doctors, who like Dr. Gilbert found no evidence that Veith was experiencing bile reflux disorder.

*and care at that time.*

(Emphasis added).

[¶48.] Veith argues that inclusion of this instruction incorrectly suggested to the jury that circumstances or information discovered subsequent to his surgery should not be considered in assessing whether Dr. O'Brien acted negligently. Veith now attempts to rationalize that this instruction forecloses the jury's consideration of whether Dr. O'Brien violated a standard of care by not conducting an intra-operative leak test; by not ordering oral contrasts along with CAT scans; by discharging Veith from the hospital too soon[22] and by failing to timely diagnose and treat his gastrointestinal leak because they all were events that occurred after the November 13, 2001 surgery or were brought to Veith's attention thereafter.

[¶49.] Veith's contention is a misinterpretation of the law set out in the instruction. What is correctly set out in the instruction is the law that we cited in *Shamburger v. Behrens*, 418 NW2d 299 (SD 1988) (*Shamburger II*). In *Shamburger II*, we affirmed the trial court's use of an instruction, in regard to a medical negligence claim, setting out that the defendant's performance should be judged "in accordance with the standard of care applicable to him as of the time of events complained of. . . ." 418 NW2d at 305-06.[23]

---

22. In addition to marked improvement in Veith's post-operative hematoma, pneumonia, blood pressure, white-blood-cell count and his normal heart rate, Dr. O'Brien's patient notes reflect that on the date of discharge, November 22, 2001, Veith wanted to go home.

23. *Shamburger II* established the principle in South Dakota case law that medical specialists will be measured by a national rather than local standard of care.

[¶50.]     Illustrative of Veith's misinterpretation is the fact that he has failed to cite any authority in support of his argument on appeal with regard to this instruction. Veith therefore waives this issue on appeal, with respect to Instruction No. 25, for failure to cite authority in violation of SDCL 15-26A-60(6). *See* State v. Pellegrino, 1998 SD 39, ¶22, 577 NW2d 590, 599 (citing State v. Knoche, 515 NW2d 834, 840 (SD 1994); State v. Dixon, 419 NW2d 699, 701 (SD 1988)) (failure to cite supporting authority on appeal is a violation of SDCL 15-26A-60(6) and the issue is thereby waived).

*Instruction No. 26*

> A physician is not *necessarily* negligent because the physician *errs in judgment* or because efforts prove unsuccessful. *The physician is negligent if the error in judgment or lack of success is due to a failure to perform any of the duties as defined in these instructions.*

(Emphasis added).

[¶51.]     On appeal, Veith now clearly avers that this instruction misstates the law because it includes "error in judgment" language that he claims for all intents and purposes absolves Dr. O'Brien of negligence as long as such acts or omissions were judgment errors. Veith now asks this Court to nullify SDPJI 105-01-(C), replicated here as Jury Instruction No. 26, henceforth abolishing the inclusion of "error in judgment" language in jury instructions, arguing that its continued application is inherently confusing.

[¶52.]     In *Papke v. Harbert*, 2007 SD 87, __ NW2d __, we conducted an extensive analysis as to the various decisions from other jurisdictions concerning

-26-

"error in judgment" and similar instructions. Thus, we need not revisit that analysis here. In *Papke* we concluded that:

> Because error in judgment or any similar language in no way further defines or explains the applicable standard of care to the jury, we hold that such language should not be used *in ordinary medical malpractice actions*[.]

2007 SD 87, ¶50, __NW2d at __ (emphasis added). However, at the same time we also recognized that *in limited circumstances* use of the error in judgment instruction is still appropriate:

> Because medicine is not an exact science and a physician in some instances may be presented with multiple methods of acceptable treatment for a particular condition, a physician must be allowed to exercise his or her professional judgment. Therefore, there may be instances in which a jury may be instructed that the physician's choice of treatment from multiple acceptable treatments available is not necessarily negligence. Such instruction, however, cannot propose that the physician may commit mere error or mistake and not be liable.

*Id.* ¶50 n15, __ NW2d at __ n15 (emphasis added).

[¶53.]     In *Papke*, we concluded that there was prejudicial error and that a new trial was warranted when the error in judgment instruction was given where a physician admitted error, but based his defense to a negligence claim on an "error in judgment" argument. *Id.* ¶52, __ NW2d at __. Herein, we are faced with the exception discussed in *Papke*; that being where there is evidence that the doctor was making a reasoned medical decision between two accepted forms of treatment, in this case the Roux-en-Y gastric bypass versus the loop gastric bypass. Thus, it was appropriate to instruct the jury that Dr. O'Brien's choice of one over the other was not necessarily negligence.

[¶54.] That leaves us with the effect of the word "error" in the disputed instruction. Under our analysis in *Papke,* it is no longer deemed appropriate.[24] A review of the transcript establishes that unlike *Papke* where the doctor conceded error*,* and the defense was largely based on the "error in judgment" instruction, here it was an inconsequential focus of Dr. O'Brien's defense. In closing argument to the jury, it merited only one brief reference by defense counsel.

[¶55.] Moreover, even plaintiff's counsel saw little problem with the instruction as it relates to negligence in treatment. Counsel only saw a problem as it related to informed consent. "A party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds of the objection." SDCL 15-6-51(c)(1).[25] Veith's basis for disapproval of the instruction now differs from that offered during settlement of instructions as the following exchange reflects:

---

24. In *Papke,* we cited approvingly an instruction from *Ouellette By Ouellette v. Subak*, 391 NW2d 810 (Minn 1986)*:*

   If there are *two methods of treatment* for a particular medical condition, *both accepted by the medical profession*, then there is a matter of professional opinion or judgment which is best, and the doctor's choice of either is, ordinarily, not negligence.

   391 NW2d at 815 (emphasis included in original).

25. SDCL 15-6-51(c)(1) incorporates the principle set out in SDCL 15-6-51(a) prior to its amendment in 2006. At the time of trial in this case, SDCL 15-6-51(a) provided in pertinent part:

   No party may claim error for the giving or failure to give an instruction unless that party objects stating distinctly the matter objected to and the grounds for the objection.

| [Trial Court]: | Any objection from plaintiff to 26? |
| --- | --- |
| [Plaintiff's Counsel]: | Yes, your Honor.  Notwithstanding that this is a pattern instruction, it does not apply in every medical negligence case.  And in this situation, it certainly does not apply to the negligence claim, and likewise, *does not apply to the informed consent claim.  A juror reading this instruction would have no idea that this does not apply to the informed consent claim*, which is a separate and distinct claim in this case.  And this shouldn't be given at all because there was no error of judgment situation, but even if the [c]ourt does give it over our objection, *it should be modified so the jury knows it doesn't apply to informed consent.  They could take this, wave it around, and say, well, if there was some issue of judgment, that the plaintiff cannot prevail, and that is not true under the informed consent.* |
| [Trial Court]: | . . . I am going to overrule the objection. I think that it is clear, it does relate to negligence, and it seems to me that in the instructions we have informed the jury as to what is informed consent, the elements, and then we talk about the failure of the physician to follow the standard of care as being negligence, but this instruction relates to the negligence claim, and the objection is overruled. |

[¶56.]     Based on the above objection, it appears that plaintiff's counsel had little concern about the instruction as it related to negligence in treatment.  It is also hard to conceive how a trial court would conclude this protest constituted an objection which would trigger the analysis found in *Papke*.  Finally, no authority was cited to persuade the trial court this instruction should not be given.  *See*

-29-

*Pellegrino*, 1998 SD 39, ¶22, 577 NW2d at 599. Given the nature of Veith's objection and that the main focus of Dr. O'Brien's defense was other than an "error in judgment" argument, we affirm the trial court.

*Instruction No. 39*

> The Defendants are sued as principal and agent. Sioux Valley Clinic, Corp. d/b/a/ Surgical Associates is the principal and Dr. Peter O'Brien is its agent. If you find Dr. Peter O'Brien, the agent, is liable, then you must find Sioux Valley Clinic, Corp. d/b/a Surgical Associates, the principal, is also liable. However, if you find Dr. Peter O'Brien, the agent, is not liable, then you must find that Sioux Valley Clinic, Corp. d/b/a Surgical Associates, the principal, is not liable.

[¶57.] Veith argues that this instruction is an inaccurate statement of agency law as related to the duty to obtain informed consent. On that issue, Veith contends that tying Sioux Valley Clinic's liability, on respondeat superior, to Dr. O'Brien's, improperly precluded the jury's consideration of Sioux Valley Clinic's liability for nurses or other employees shown to have a responsibility to obtain informed consent.

[¶58.] In support of this argument that he was deprived a favorable judgment on his informed consent claim due to this instruction, Veith points to the testimony of Dr. O'Brien's nurse Pam Kludt. He claims that her testimony indicates that it was her responsibility, or that of other staff at Sioux Valley Clinic, to distribute the booklets describing the various gastric bypass procedures and that she and staff sometimes failed to distribute them. This, however, is not an accurate representation of Kludt's testimony.

[¶59.] What Kludt's testimony actually reveals is that new patients were all required to receive both Dr. O'Brien's booklet and the ASBS booklet prior to the initial consultation. She or other staff would mail both booklets together along with instructions to bring them with to the first consultation.[26] A supply of both booklets was kept at the reception desk so that if a new patient came for the initial consultation without either booklet, one would be given to him at that time. Patients would then be taken to an examination room for their consultation with Dr. O'Brien. If for some reason the patient failed to make it to the examination room without either booklet, a supply of both was kept there as well so that the patient would have both in hand at that point. Finally, if the patient did not have both booklets in hand when Dr. O'Brien came into the examination room for the consultation, he personally would reach into the cupboard and supply whatever was needed so that the patient had both booklets in hand as Dr. O'Brien went through them.

[¶60.] In point of fact, Veith at no time alleged Sioux Valley Clinic's liability on respondeat superior was ever tied to anyone, but Dr. O'Brien. Nonetheless, Veith now cites several of our prior holdings for the proposition that a hospital's liability on respondeat superior is not predicated solely on the acts of physicians, but rather employees in general. *See* Fjerstad v. Knutson, 271 NW2d 8 (SD 1978) (overruled on other grounds by *Shamburger v. Behrens*, 380 NW2d 659 (SD 1986)

---

26. Veith allegedly received the ASBS booklet in advance of the consultation, but not Dr. O'Brien's. When Kludt was asked how this could have happened, she could not explain because the booklet's were always mailed together.

(*Shamburger I*)); Koeniguer v. Eckrich, 422 NW2d 600 (SD 1988); Wuest *ex rel.* Carver v. McKennan Hosp., 2000 SD 151, 619 NW2d 682.  However, these cases all stand for the proposition that hospital liability is based on employee negligence. Veith's issue on appeal in regard to this instruction is based on error as it applies to his informed consent claim.  Moreover, the record does not reflect and it has never been argued that his negligence claim arises out of anything but the alleged acts or omissions of Dr. O'Brien.  Therefore, our prior holdings provide no support for Veith's position.  Conversely, when the matter of a patient's informed consent is at issue, we have consistently recognized that it is the *physician's duty* to make full disclosure to and obtain informed consent from the patient.  *See* Savold v. Johnson, 443 NW2d 656, 659 (SD 1989); Wheeldon v. Madison, 374 NW2d 367, 372 (SD 1985); Alberts v. Giebink, 299 NW2d 454, 456 (SD 1980); Cunningham v. Yankton Clinic, P.A., 262 NW2d 508, 511 (SD 1978), *abrogated on other grounds by* SDCL 15-2-14.3 (1979).  Furthermore, instructions Nos. 18-20, which Veith offered no objection to on this ground, correctly convey this principle to the jury.

[¶61.]    Although Dr. O'Brien's subordinates may have assisted him by distributing booklets to new patients, nowhere in the record can it be found that he delegated to them his duty to obtain patients' informed consent for this extremely technical and serious gastrointestinal reconstructive procedure.  Even assuming *arguendo* that he had, Dr. O'Brien still would have been liable for failure to obtain Veith's informed consent, since "[e]ven an effective delegation does not relieve the delegating party . . . of its duty."  *See* E. Allen Farnsworth, *Contracts* 742 (3rdEd 1999).

[¶62.] We cannot find any basis on which to determine that Veith was denied a fair trial and hence no abuse of discretion by inclusion of Instruction No. 39. The record contained sufficient evidence from which a jury could reasonably conclude that Dr. O'Brien obtained Veith's informed consent before surgery, thereby mooting Veith's claim of respondeat superior as to informed consent.

[¶63.] Veith argues that he was denied a fair trial because the trial court erred by refusing a proposed instruction setting out that his informed consent and negligence claims were separate and distinct.

*Requested Instruction No. 27*

> A physician who discusses with a patient the complications and potential risks of a medical procedure may not be relieved of negligence if such negligence was the result of the physician's breach of the standard of care as is defined elsewhere in these instructions.

[¶64.] Veith cites *Leisinger v. Jacobson*, 2002 SD 108, 651 NW2d 693, *overruled by State v. Martin*, 2004 SD 82, 683 NW2d 399, in support of his argument with respect to this instruction. In *Leisinger*, we followed the principle that a "[f]ailure to give a requested jury instruction that correctly sets forth the law is prejudicial error." *Id.* ¶8, 651 NW2d at 696. However, in *Martin*, we overruled *Leisinger*. 2004 SD 82, ¶¶37, n5, 42, 683 NW2d at 411-13.

[¶65.] Furthermore, as the trial court implied, Instruction No. 27 is unnecessarily repetitious. Herren v. Gantvoort, 454 NW2d 539, 542 (SD 1990) (citing State v. Cook, 319 NW2d 809, 814 (SD 1982)) ("It is not error for the trial court to refuse to give jury instructions which are already embodied in other given instructions"). When viewed as a whole, we find that the jury instructions clearly

informed the jury that Veith's complaint alleged two claims against Dr. O'Brien and

that finding he had obtained informed consent, would not foreclose the possibility of

liability on the negligence claim.[27]  *See In re* Estate of Duebendorfer, 2006 SD 79,

---

27.  The following instructions, clarifying that Veith had two separate and distinct claims were included in the settled jury instructions:

Instruction No. 2 in pertinent part:

The  plaintiff . . . alleges that Dr. O'Brien failed to obtain plaintiff's informed consent prior to performing a gastric by-pass surgery on November 13, 2001. The plaintiff further alleges that Dr. O'Brien was negligent in his care and treatment of plaintiff in connection with the gastric bypass surgical procedure that was performed on November 13, 2001, and in his care and treatment of plaintiff following surgery.

Instruction No. 29 in pertinent part:

In this action, the plaintiff has the burden of proving the following issues:

(1) That the defendants failed to obtain plaintiff's informed consent prior to medical treatment; or
(2) That the defendants violated the standard of care as defined elsewhere in these instructions and were negligent in their medical treatment of plaintiff; and
(3) That such failure to obtain informed consent and/*or negligence* was the legal cause of any damage, injury, or loss suffered or experienced by plaintiff; and
(4) The amount of any damage, injury, or loss suffered or experienced by plaintiff and legally caused by defendants' failure to obtain informed consent and/*or negligence. . . .*

(Emphasis added).

Instruction No. 30 in pertinent part:

In this case there are claims for failure to obtain informed consent and negligence allegedly resulting in injury to plaintiff.  Regarding these claims, the issues to be determined are these:

(continued . . .)

¶24, 721 NW2d 438, 445 (quoting Kappenman v. Stroh, 2005 SD 96, ¶14, 704 NW2d 36, 40) (applying standard whereby we "construe[ ] jury instructions as a whole to learn if they provided a full and correct statement of the law"). Therefore, we find no error in the trial court's refusal to include requested Instruction No. 27 in the settled list.

[¶66.]     **6.     Whether the trial court erred by allowing defense counsel's comments in regard to plaintiff's expert during closing argument.**

[¶67.]     Veith asserts that defense counsel's remarks about plaintiff's expert, Dr. Balliro, constituted an irregularity in the proceedings under SDCL 15-6-59(a)(1) thereby prejudicing the jury and denying him a fair trial. However, Veith failed to

---

(. . . continued)

First, *did the defendant's fail to obtain plaintiff's informed consent prior to performing a gastric bypass surgery on November 13, 2001?*

*If your answer to that question is "no," you will* return a verdict for the defendants on plaintiff's claim of failure to obtain informed consent and then *continue on to determine the second issue listed below.* If your answer is "yes," you will also consider the second issue below:

Second, were the defendants negligent, as defined by these instructions, in their care and treatment of plaintiff?

If your answer to that question is "no" you will return a verdict for the defendants on plaintiff's claim of negligence. If your answer is " yes" to the first issue as to plaintiff's claim of failure to obtain informed consent and/*or if your answer is "yes" to plaintiff's claim of negligence, then you must determine a third issue*: Was that failure to obtain informed consent and/*or negligence* a legal cause of any injury or damage to plaintiff?
. . .

(Emphasis added and included)

We would also point out that the Verdict Form embodies the same procedure set out in Instruction No. 30.

preserve this issue for appeal by not offering proper objection during closing. "The rule is that the objection to argument of counsel must be made at the time of the improper argument, remark, or other misconduct." Behseleck v. Andrus, 60 SD 204, 244 NW 268, 270 (1932) (citing 3 CJ 864). When a party fails to object to argument of counsel at trial, he deprives the trial court the opportunity to rule on the issue and admonish the jury or give a curative instruction. *Janklow*, 2005 SD 25, ¶47, 693 NW2d at 701. When a party deprives the trial court an opportunity to rule on the issue by failing to object to argument at the time the objectionable comments are made, he waives his right to argue the issue on appeal. *Id.* ¶47, 693 NW2d at 701 (quoting State v. Boston, 2003 SD 71, ¶26, 665 NW2d 100,109 (citing State v. Corey, 2001 SD 53, ¶9, 624 NW2d 841, 844); City of Sioux Falls v. Kelley, 513 NW2d 97, 110 (SD 1994) (citations omitted) (holding that plaintiff's failure to object to the improper comments of defendant during closing arguments resulted in waiver of plaintiff's right to argue the issue on appeal because the trial court was not given an opportunity to rule on the issue); *see Anderson*, 441 NW2d at 677 (SD 1989) (holding that plaintiff's failure to request a mistrial due to defense counsel's improper statements during closing argument foreclosed his opportunity to argue it on appeal); State v. Handy, 450 NW2d 434, 435 (SD 1990) (holding that defendant did not preserve his challenge to alleged prosecutorial misconduct where he did not timely object)); Arbach v. Gruba, 89 SD 322, 232 NW2d 842 (1975); *see also Till*, 281 NW2d 276; *Carlson,* 392 NW2d 89; *Triple U Enterprises, Inc.*, 388 NW2d 525; *John Deere Company*, 306 NW2d 231; Matter of A.I., 289 NW2d 247 (SD 1980).

[¶68.] While it is certainly appropriate to question the expertise and possible bias of an expert witness through cross-examination and comment thereon during closing argument to the jury, defense counsel's comments about plaintiff's expert were arguably inflammatory. The fact that they come recommended by a trial techniques seminar is not definitive. However, there is no prejudicial error and no irregularity in the proceedings because Veith's failure to offer proper objection to defense counsel's comments deprived the trial court an opportunity to admonish the jury or give a curative instruction. Consequently, Veith failed to preserve the issue below for our review on appeal.

[¶69.] For all the foregoing reasons, we affirm.[28]

[¶70.] SABERS, KONENKAMP, ZINTER, and MEIERHENRY, Justices, concur.

---

28. Because we affirm the judgment below for Dr. O'Brien, Veith's issue on evidence admitted for determination of damages and Dr. O'Brien's issue on extrinsic evidence allowed to refute his testimony in regard to the informed consent claim are mooted.