#24921, #24930, #25062-a-GAS

**2010 SD 14**

IN THE SUPREME COURT

OF THE

STATE OF SOUTH DAKOTA

* * * *

TANNER WANGSNESS,                                  Plaintiff and Appellant,

  v.

BUILDERS CASHWAY, INC.,                         Defendant and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF

THE THIRD JUDICIAL CIRCUIT

HAND COUNTY, SOUTH DAKOTA

* * * *

HONORABLE JON R. ERICKSON
Judge

* * * *

PETER W. SOMMERVOLD
ARLO D. SOMMERVOLD of
Sommervold Law Firm
Sioux Falls, South Dakota                        Attorneys for plaintiff
                                          and appellant.

ROCHELLE R. CUNDY of
Murphy, Goldammer & Prendergast, LLP
Sioux Falls, South Dakota                        Attorneys for defendant
                                          and appellee.

* * * *

ARGUED OCTOBER 6, 2009

OPINION FILED **02/10/10**

#24921, #24930, #25062

SEVERSON, Justice

[¶1.]    Tanner Wangsness (Wangsness) brought this strict products liability action against Builders Cashway, Inc. (Builders Cashway), alleging the bi-fold door his grandfather purchased from Builders Cashway was defective. Wangsness's strict products liability action against Builders Cashway proceeded to trial. After hearing the evidence, the jury rendered a verdict, and the circuit court entered a judgment in favor of Builders Cashway. We affirm.

## BACKGROUND

[¶2.]    Builders Cashway, Inc. is a hardware store and lumberyard in Miller, South Dakota. Builders Cashway sells hundreds of farm and home repair products, including fencing, paint, wallpaper, shades, blinds, insulation, sheetrock, and siding. Dennis Cundy established Builders Cashway in 1978.

[¶3.]    Wangsness, Inc. is a farming and ranching operation located southwest of Miller, South Dakota, and operated by Darrell Wangsness and his brother, Mark. In 1991, Wangsness, Inc. sought to replace the sliding door on its Quonset building, which was originally built in the 1950s. Mark Wangsness selected and purchased a bi-fold door from Builders Cashway. The door was manufactured by Schweiss Chicken Pluckers (Schweiss) and was installed by Builders Cashway employees.

[¶4.]    The bi-fold door purchased by Wangsness, Inc. utilized a horizontal hinge system that allowed the door to fold into two halves. When opened, the door folded outside the building, thereby providing overhead clearance inside the building. The door was set in motion by a switch box connected by a cord to the bi-fold door's motor. This switch box was not mounted in a stationary position but sat

on a work bench near the door. A rotating shaft and cable mechanism, located on the bottom left-hand side of the door, winched the door upward. The door rose as the cable wrapped around a rotating shaft. The point at which the cable wrapped around the shaft was plainly visible.

[¶5.]    On August 4, 2003, fifteen-year-old Wangsness and his grandfather, Darrell, arrived at the Quonset building shortly after lunch. The two planned to work on a vehicle in the building. Darrell first went to the nearby house to make a phone call. Meanwhile, Wangsness opened the bi-fold door to the Quonset building. Shortly thereafter, Wangsness appeared at the door of the nearby house, displaying serious injuries to his hands. Wangsness had set the bi-fold door in motion and an incident occurred, amputating the four fingers of his left hand. No one other than Wangsness was present, and Wangsness maintains he does not remember the incident.

[¶6.]    Prior to the summer of 2003, Wangsness was living and working on the Wangsness, Inc. farm. He spent a little more than ten hours per week working for Wangsness, Inc. He primarily assisted by mowing grass and moving vehicles around the farm. He also worked on cars in and around the Quonset building. He therefore regularly observed the operation of the bi-fold door on the building, particularly in the summer. He operated the door himself on at least two occasions prior to the accident. Wangsness never received any specific instruction on the use of the door, because, as Darrell testified, the door "is so simple" that no instruction on its operation is necessary.

[¶7.] Wangsness initiated this lawsuit against Builders Cashway and Schweiss in April 2006. In May 2007, Schweiss filed a motion for summary judgment. Schweiss claimed they had filed for bankruptcy, thereby extinguishing any potential liability to Wangsness. They also asserted that Schweiss Distributing, the successor corporation that purchased the assets of Schweiss, was not liable to Wangsness. Wangsness did not oppose the motion, and the circuit court granted judgment in favor of Schweiss. Wangsness thereafter stipulated to dismiss Schweiss with prejudice.

[¶8.] Wangsness proceeded with his strict liability claims against Builders Cashway. He alleged the bi-fold door was defective due to (1) the unguarded nature of the rotating shaft and cable and (2) the lack of adequate warning as to the door's use. After hearing the evidence, the jury rendered a verdict, and the circuit court entered a judgment in favor of Builders Cashway. Wangsness appeals. Builders Cashway also presents issues for this Court's consideration by notice of review.

## STANDARD OF REVIEW

[¶9.] The applicable standard of review varies depending on whether the issue is one of fact or one of law. A circuit court's findings of fact will not be set aside unless they are clearly erroneous. SDCL 15-6-52(a). The question is not whether this Court would have made the same findings the circuit court did, but whether on the entire evidence, "we are left with a definite and firm conviction a mistake has been committed." New Era Mining Co. v. Dakota Placers, Inc., 1999 SD 153, ¶7, 603 NW2d 202, 204. By contrast, conclusions of law are reviewed under a de novo standard, giving no deference to the circuit court's conclusions of law. *Id*.

[¶10.]      We have previously clarified our standard of review for jury instructions as follows:

> A trial court has discretion in the wording and arrangement of its jury instructions, and therefore we generally review a trial court's decision to grant or deny a particular instruction under the abuse of discretion standard. However, no court has discretion to give incorrect, misleading, conflicting, or confusing instructions: to do so constitutes reversible error if it is shown not only that the instructions were erroneous, but also that they were prejudicial.

State v. Cottier, 2008 SD 79, ¶7, 755 NW2d 120, 125 (quoting State v. Packed, 2007 SD 75, ¶17, 736 NW2d 851, 856) (quoting Vetter v. Cam Wal Elec. Coop., Inc., 2006 SD 21, ¶10, 711 NW2d 612, 615 (internal citations omitted))). "Erroneous instructions are prejudicial . . . when in all probability they produced some effect upon the verdict and were harmful to the substantial rights of a party." SDCL 15-6-61. *See Cottier*, 2008 SD 79, ¶7, 755 NW2d at 125 (citations omitted).

[¶11.]      Evidentiary rulings made by the circuit court are presumed correct and are reviewed under an abuse of discretion standard. State v. Boston, 2003 SD 71, ¶14, 665 NW2d 100, 105 (citing State v. Goodroad, 1997 SD 46, ¶9, 563 NW2d 126, 129 (citing State v. Oster, 495 NW2d 305, 309 (SD 1993)). "The test is not whether we would have made the same ruling, but whether we believe a judicial mind, in view of the law and the circumstances, could have reasonably reached the same conclusion." *Id*. If error is found, it must be prejudicial before this Court will overturn the circuit court's evidentiary ruling. *Id*. (citing State *ex rel*. Dep't of Transp. v. Spiry, 1996 SD 14, ¶11, 453 NW2d 260, 263).

## DECISION

### *Appeal #24921*

[¶12.]    1.    **Whether the circuit court abused its discretion by instructing the jury on the doctrine of assumption of the risk.**

[¶13.]    Wangsness argues the circuit court erred by instructing the jury on the doctrine of assumption of the risk. It is well established in South Dakota that assumption of the risk is a defense to a claim of strict products liability. *See* Berg v. Sukup Mfg. Co., 355 NW2d 833, 835 (SD 1984). A plaintiff assumes the risk when he is "aware the product is defective, knows the defect makes the product unreasonably dangerous, has reasonable opportunity to elect whether to expose himself to the danger, and nevertheless proceeds to make use of the product." Smith v. Smith, 278 NW2d 155, 161 (SD 1979). "A person is deemed to have appreciated the risk 'if it is the type of risk that no adult of average intelligence can deny.'"[1] Duda v. Phatty McGees, Inc., 2008 SD 115, ¶13, 758 NW2d 754, 758

---

1.    Because Wangsness was fifteen-years-old at the time of the accident, the circuit court instructed the jury on the standard of care applicable to minors:

> Generally, a minor is not held to the same standard of conduct as that of an adult unless he engages in an activity normally only undertaken by adults. The objective standard of the reasonably prudent person does not apply to a minor, but rather a special subjective standard of care is used which takes into account his age, intelligence, maturity, experience, and capacity. In other words, the standard of conduct of a minor is what is reasonable to expect of children of like age, intelligence, maturity, capacity, and experience.

*See* Tipton v. Town of Tabor, 1997 SD 96, ¶57, 567 NW2d 351, 370; Alley v. Siepman, 87 SD 670, 674, 214 NW2d 7, 10 (1974); Finch v. Christensen, 84

(continued . . .)

(quoting Ray v. Downes, 1998 SD 40, ¶15, 576 NW2d 896, 898 (quoting Westover v. E. River Elec. Power Coop., Inc., 488 NW2d 892, 901 (SD 1992))). The plaintiff must have knowledge of the specific defect and risk posed rather than simple generalized knowledge that he has entered a zone of danger. Novak v. Navistar Int'l Transp. Corp., 46 F3d 844, 848-49 (8th Cir 1995).

[¶14.]    We consider whether the instruction on the doctrine of assumption of the risk was supported by the evidence or issues raised at trial. A circuit court should instruct the jury on issues "supported by competent evidence in the record." Johnson v. Armfield, 2003 SD 134, ¶7, 672 NW2d 478, 481 (quoting Artz v. Meyers, 1999 SD 156, ¶8, 603 NW2d 532, 534) (quoting Kuper v. Lincoln-Union Elec. Co., 1996 SD 145, ¶32, 557 NW2d 748, 758)). In determining whether the instruction was proper, the plaintiff's "claim that the evidence was insufficient to establish assumption of the risk is viewed 'in the light most favorable to upholding the verdict.'" *Armfield*, 2003 SD 134, ¶7, 672 NW2d at 481 (quoting Parker v. Casa Del Rey, 2002 SD 29, ¶5, 641 NW2d 112, 115) (quoting Engberg v. Ford Motor Co., 87 SD 196, 201, 205 NW2d 104, 106 (1973))).

[¶15.]    Evidence relevant to the doctrine of assumption of the risk was presented at trial. Wangsness worked on cars in and around the Quonset building. He regularly observed the operation of the bi-fold door, particularly in the summer. He also operated the door himself on at least two occasions prior to the accident.

---

(. . . continued)
    SD 420, 426, 172 NW2d 571, 574 (1969); Wittmeier v. Post, 78 SD 520, 525-27, 105 NW2d 65, 67-68 (1960).

The rotating shaft and cable were open and obvious. Wangsness understood that failing to keep his hands away from the rotating shaft and cable mechanism on the bi-fold door could result in serious injury. Likewise, Wangsness's experts testified that a reasonable person could appreciate the visible danger of the rotating shaft and cable mechanism. The evidence presented was sufficient to submit the issue of assumption of the risk to the jury.[2]

[¶16.]     **2.     Whether the circuit court abused its discretion by excluding the testimony of Dr. Joel Huber regarding Wangsness's alleged memory loss.**

[¶17.]     In its Interrogatories and Requests for Production (First Set), Builders Cashway asked Wangsness to provide the names and opinions of the expert witnesses he expected to call at trial. Wangsness identified Jim Suhr, Dr. Daniel Humberg, Rick Ostrander, and "all medical providers that treated Plaintiff for his injuries" as potential expert witnesses. Wangsness, however, did not provide a written report of the opinions of Dr. Joel Huber, the family physician who treated Wangsness in the emergency room of the Hand County Memorial Hospital immediately following his accident. When Wangsness took the deposition of Dr.

---

2.     Builders Cashway requested a special verdict form that would have specifically identified the basis for the jury's decision. However, Wangsness objected and requested a general verdict form. The circuit court sustained his objection and provided the jury with a general verdict form. A special verdict form would have made clear what effect the instruction on the doctrine of assumption of the risk had on the jury's ultimate determination. *See* Miller v. Hernandez, 520 NW2d 266, 270 (SD 1994). As it stands, we cannot know which theory the jury accepted, so we must assume the jury decided the case on a proper theory. Martinmaas v. Engelmann, 2000 SD 85, ¶72, 612 NW2d 600, 615 (Konenkamp, J., concurring in result). The jury's verdict should be affirmed as there exist valid bases for the general verdict in favor of Builders Cashway.

Huber on January 11, 2008, he attempted to elicit testimony from Dr. Huber that his injuries likely caused him to suffer memory loss. Prior to trial, Builders Cashway moved to exclude Dr. Huber's testimony regarding Wangsness's alleged memory loss as he was offering expert testimony not properly disclosed prior to trial. After taking the matter under advisement, the circuit court granted Builders Cashway's motion. Wangsness appeals that decision.

[¶18.]        SDCL 19-15-2 sets forth the requirements for the admission of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

"A lay witness, on the other hand, 'may give an opinion if he has personal knowledge of the matter.'" State v. Andrews, 2001 SD 31, ¶17, 623 NW2d 78, 83 (quoting Atkins v. Stratmeyer, 1999 SD 131, ¶17, 600 NW2d 891, 897). "Lay witness testimony is limited to 'those opinions or inferences which are (1) rationally based on the perceptions of the witness and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue.'" *Id.* (quoting SDCL 19-15-1).

[¶19.]        SDCL 15-6-26(b)(4)(A)(i) allows a party to discover facts known and opinions held by experts acquired or developed in anticipation of litigation or for trial. That statute provides:

> A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

SDCL 15-6-26(b)(4)(A)(i).  Ordinarily, a treating doctor is treated as a lay witness and no written report need be furnished:

> The requirement of a written report . . . applies only to those experts who are retained or specially employed to provide [expert] testimony in the case or whose duties as an employee of a party regularly involve the giving of such testimony.  A treating physician, for example, can be deposed, or called to testify at trial without any requirement for a written report.

Fed R Civ P 26(2)(B) advisory committee's note.  However, a treating doctor will be treated as a lay witness only when his knowledge and opinions were obtained in the course of treatment and through his own perceptions.  Vieth v. O'Brien, 2007 SD 88, ¶45, 739 NW2d 15, 28.

[¶20.]        Dr. Huber did not develop the proffered medical opinions in the course of treating Wangsness.  Treating physicians are treated as lay witnesses only when their knowledge and opinions are obtained outside the realm of litigation.  *Id.* ¶42, 739 NW2d at 27-28 (citing Day by Ostby v. McIlrath, 469 NW2d 676, 677 (Iowa 1991)).  Here, Dr. Huber must be treated as an expert witness because his opinions regarding Wangsness's memory loss were developed in a deposition in anticipation of litigation.  The circuit court's exclusion of Dr. Huber's testimony concerning Wangsness's alleged memory loss for failure to disclose a report setting forth his opinions was not an abuse of discretion.

[¶21.]        A contrary holding would allow an end-run around our discovery procedures.  *See Andrews*, 2001 SD 31, ¶19, 623 NW2d at 84.  It would allow litigants to elicit expert opinions from treating physicians in the course of litigation without any duty to disclose those opinions to opposing counsel.  We therefore

reaffirm our previous holding that treating physicians will not be treated as lay witnesses when their knowledge and opinions are obtained in the course of or in anticipation of litigation. *Vieth*, 2007 SD 88, ¶42, 739 NW2d at 27-28.

[¶22.]       **3.       Whether the circuit court abused its discretion by instructing the jury that it could only consider whether the bi-fold door was defective as of the date of sale and by excluding evidence of subsequent remedial measures.**

[¶23.]       Wangsness asserted two theories of strict products liability: (1) the unreasonably dangerous nature of the unguarded rotating shaft and cable mechanism and (2) the lack of adequate warning as to the door's use. SDCL 20-9-9 limits the liability of retailers for defects in the products they sell:

> No cause of action based on the doctrine of strict liability in tort may be asserted or maintained against any distributor, wholesaler, dealer or retail seller of a product which is alleged to contain or possess a latent defective condition unreasonably dangerous to the buyer, user, or consumer unless said distributor, wholesaler, dealer, or retail seller is also the manufacturer or assembler of said product or the maker of a component part of the final product, or unless said dealer, wholesaler or retail seller knew, or, in the exercise of ordinary care, should have known, of the defective condition of the final product.

Schweiss began manufacturing bi-fold doors with guarded rotating shaft and cable mechanisms after Builders Cashway sold this door to Wangsness Inc., but before Wangsness suffered his injury. Builders Cashway received a brochure showing a guard on the rotating shaft and cable mechanism. Wangsness argues Builders Cashway had a continuing duty to warn customers of defects in the products it sold. He argues the brochure put Builders Cashway on notice of a product defect of which it had a duty to warn its customers. Wangsness also believes evidence of this

subsequent remedial measure is proof of the unreasonably dangerous nature of the unguarded rotating shaft and cable mechanism.

[¶24.] Wangsness relies primarily on *Novak* to argue Builders Cashway had a continuing duty to warn of defects in the products it sold. 46 F3d 844. *Novak*, a South Dakota farmer, attempted to start his tractor with the gear selector in the neutral position and the park lock engaged. The engine did not turn over, so Novak got off the tractor and attempted to "jump-start" it. The starter engaged, the engine started, and the tractor began to move forward. Novak was thrown to the ground and was run over by a planter. Novak brought a strict products liability suit against Navistar, the tractor manufacturer. Novak alleged that due to a product defect in the tractor, an operator could move the gear selector to the neutral spot so that it was possible to engage the park lock while the tractor actually remained in gear. Navistar had produced a component part to address this defect after Novak purchased his tractor, but made no effort to recall the defective tractors or inform owners or dealers of the problem. On appeal, the Eighth Circuit, relying on South Dakota case law, held the jury should have been instructed that a manufacturer has a continuing duty to give adequate warnings of dangers inherent in the product's use of which the defendant learns after the sale. *Novak*, 46 F3d 844.

[¶25.] Wangsness's reliance on *Novak* is misplaced. The *Novak* court considered the duty of a *manufacturer* to warn users of a product defect where the manufacturer had knowledge of the danger and had begun manufacturing component parts that eliminated the problem. *Id*. Builders Cashway was not the manufacturer of the bi-fold door and had no knowledge of any product defect.

*Novak* does not place a continuing duty on retailers to warn of defects of which they are not aware in the products they have sold.[3]

[¶26.]		Furthermore, evidence of subsequent remedial measures potentially confuses the issue in strict products liability actions. SDCL 20-9-10.1 provides:

> In any products liability action based upon negligence or strict liability, whether the design, manufacture, inspection, testing, packaging, warning, or labeling was in conformity with the generally recognized and prevailing state of the art existing at the time the specific product was first sold to any person not engaged in the business of selling such product, may be considered in determining the standard of care, whether the standard of care was breached or whether the product was in a defective condition or unreasonably dangerous to the user.

"[E]vidence of subsequent remedial measures tends to divert the jury's attention from whether the product was defective at the time it was manufactured and sold to some later point in time." First Premier Bank v. Kolcraft Enters., Inc., 2004 SD 92, ¶52, 686 NW2d 430, 451. "If the time of product sale is the relevant point for deciding liability in strict liability cases, then product knowledge acquired after that point is irrelevant." *Id*. The circuit court did not abuse its discretion by instructing the jury to consider whether the product was defective as of the date of sale and excluding evidence of possible subsequent remedial measures.

---

3.		In 1973, this Court adopted the strict liability doctrine set forth in Restatement (Second) of Torts § 402A: "One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer." *See Engberg*, 87 SD 196, 205 NW2d 104. In 1979, however, the Legislature enacted SDCL 20-9-9, thereby limiting the liability of retailers for defects in the products they sold. We have long recognized that "[t]he Legislature is at liberty to override common law rules by statutory enactment." Pourier v. S.D. Dep't of Rev., 2004 SD 3, ¶6, 674 NW2d 314, 316 (citing SDCL 1-1-24).

[¶27.] **4. Whether the circuit court violated the collateral source rule by allowing Builders Cashway to examine Darrell Wangsness regarding the payment of medical bills.**

[¶28.] Wangsness next contends the circuit court erred in allowing Builders Cashway to examine Wangsness's grandfather, Darrell Wangsness, regarding the payment of medical bills. In a motion in limine, Builders Cashway asked the circuit court to allow evidence of the amounts Medicaid paid for Wangsness's medical bills. The circuit court denied the motion, citing the collateral source rule. At trial, Builders Cashway made an offer of proof regarding the amount of Wangsness's medical bills. The circuit court excused the jury before allowing Builders Cashway to elicit this testimony from Darrell Wangsness. This Court's precedent mandates that a proponent of excluded evidence must attempt to offer the evidence at trial and make an offer of proof. Thompson v. Mehlhaff, 2005 SD 69, ¶21, 698 NW2d 512, 520 (citing Joseph v. Kerkvliet, 2002 SD 39, ¶7, 642 NW2d 533, 535) (additional citation omitted). The circuit court did not abuse its discretion or violate the collateral source rule by allowing Builders Cashway to make an offer of proof outside the presence of the jury regarding the excluded evidence.

### Appeal #24930

[¶29.] Because we affirm the verdict in this case, we do not reach the issues raised by Builders Cashway's notice of review.

### Appeal #25062

[¶30.] **1. Whether the circuit court erred by granting Builders Cashway's application for taxation of costs.**

[¶31.] Builders Cashway filed an application for taxation of costs on June 24, 2008. Wangsness served objections to Builders Cashway's application for taxation

of costs on June 27, 2008, but never scheduled or noticed a hearing on those objections. On September 25, 2008, Builders Cashway notified the circuit court that the application for taxation of costs remained pending. Due to the passage of time and lack of notice of hearing, Builders Cashway asked the circuit court to grant the application. On October 22, 2008, the circuit court entered an order granting Builders Cashway's application for costs and disbursements. That order was filed on October 24, 2008.

[¶32.]     SDCL 15-6-54(d) provides that "costs and disbursements . . . shall be allowed as of course to the prevailing party." A party who wishes to have disbursements and costs assessed must file an application for taxation of costs and a certificate of service with the clerk of court. SDCL 15-6-54(d). A party who objects to any part of the application must file his objections with the clerk of court within ten days of the service of the application on him. *Id*. The written objections must be accompanied by a notice of hearing. *Id*. When the circuit court entered the order granting Builders Cashway's application for costs and disbursements, Wangsness had had over two months to schedule and notice the statutorily required hearing. Due to this delay, the circuit court did not abuse its discretion by granting Builders Cashway's application for taxation of costs.

[¶33.]     Affirmed.

[¶34.]     GILBERTSON, Chief Justice, and KONENKAMP, Justice, concur.

[¶35.]     ZINTER and MEIERHENRY, Justices, concur in part and concur in result in part.

ZINTER, Justice (concurring in part and concurring in result in part).

[¶36.]     I join the opinion of the Court on all issues except assumption of the risk.  On that issue, I concur in result.  In my view, there was insufficient evidence for an assumption of the risk instruction.  Nevertheless, because of the general verdict form, Wangsness has not established reversible error.  *See Majority Opinion* note 2.

[¶37.]     A circuit court may only give those instructions that are supported by evidence.  Miller v. Baken Park, Inc., 84 SD 624, 631, 175 NW2d 605, 609 (1970); Orrison v. City of Rapid City, 76 SD 145, 156, 74 NW2d 489, 495 (1956).  Therefore, to get an instruction on assumption of the risk, an affirmative defense, Builders Cashway was required to submit evidence that Wangsness had knowledge of the "specific defect and risk posed, rather than simple generalized knowledge that he has entered a zone of danger." *See Supra*¶ 13 (citing Novak v. Navistar Int'l. Transp. Corp., 46 F3d 844, 848-49 (8thCir 1995)).  Although Builders Cashway submitted evidence that Wangsness had general knowledge regarding operation of the bi-fold door, it submitted no evidence that *prior* to the accident Wangsness knew of, let alone appreciated, the risk associated with the alleged specific defect and risk posed:  the unshielded rotating shaft and cable mechanism, a component of the door.

[¶38.]     Wangsness, who was fifteen-years-old at the time, was the only witness to the accident.  Wangsness, however, had no recollection of the events leading up to and including the accident.  Further, although he was generally aware that it was a good practice to keep the area under the door clear during operations,

- 15 -

Wangsness had never heard of anyone in the family having trouble with the door, and he had not read the caution stickers on the door. Additionally, the record reflects that Wangsness never received any specific instruction on the use of the door. Thus, he testified that despite "all the years [he was] around the shop" observing the door, he was unaware that the "mechanism," the drum and cable system at issue, was part of the door. He believed the door operated on "the same principle as a regular garage door." This evidence was not contradicted.

[¶39.] Even the circumstantial evidence suggesting how the accident may have occurred did not suggest Wangsness had knowledge of the specific defect and risk posed by the drum and cable system. Wangsness testified that he would have operated the door by use of start and stop "buttons" that were located away from the door. Because the door was not usually opened all the way, Wangsness indicated that the operator needed to be "at the control" to push the stop button when operating the door. On the day of the accident, Wangsness indicated that he would have had no reason to leave that remote location at the controls to operate the door. Consistent with this method of operation, in his first statement after the accident – in an attempt to speculate with an expert how the accident may have happened – Wangsness indicated that he may have "tripped," and in reaching out to break his fall, his fingers got caught in the drum mechanism as he was falling into the door. The only other version of the accident came from Wangsness's answer to interrogatories in which he indicated that he had activated the control to raise the door, and was walking along the door when the pinch point of the door caught his

hand. None of the possible explanations suggested that Wangsness knew of the drum and cable mechanism and the risk it posed.

[¶40.] There was certainly no evidence to support the majority's claim that "Wangsness understood that failing to keep his hands away from the rotating shaft and cable mechanism on the bi-fold door could result in serious injury." *See Supra* ¶ 15. Wangsness's testimony on this point was only a reference to the danger of putting his hands into "moving machinery" in general. With respect to this door, however, he testified he did not know there was a risk of injury from the rotating shaft and cable mechanism. He explained, "you really don't see it" when you open the door. He further indicated that his understanding of the specific risk came to light only *after* the accident. He testified that "now" having seen the mechanism after the accident, he understood that he could be hurt by putting his hands in the mechanism. Wangsness's specific testimony on this issue does not support the majority's claim:

> Q: From your experience around the farm, you know you shouldn't put your hands into moving machinery, correct?
> A: Correct.
> Q: And you seen [sic] the video [after the accident], correct?
> A: Yes.
> Q: And you seen [sic] the mechanism *since* the accident, correct?
> A: Correct.
> Q: You agree that it *would be* important to keep your hands away from the cable when it's moving, correct?
> A: Correct.
> . . .
> Q: You or any person would know, based upon how that operates, that if you put your hand in it or near it, there's a risk of your hand being injured, correct?
> A: *Well, since you don't really see it, no.*
> . . .
> Q: *Having seen that mechanism now,* you *would* understand that if you put your hands in it, you *could* hurt your hand in it, correct?

A: Correct.

(Emphasis added.)

[¶41.] The majority is also incorrect in claiming: "Likewise, Wangsness's experts testified that a reasonable person could appreciate the visible danger of the rotating shaft and cable mechanism." *See Supra* ¶ 15. On the contrary, the record reflects that Wangsness's expert testified a person would *not* appreciate this risk. Expert Jim Suhr testified that a reasonable person could appreciate the risk *if* they studied the door and the video, but not if the accident happened in the manner reflected by the evidence. Suhr testified:

> Q: You don't think a reasonable person would know if they put that hand in their cable and drum that they could hurt their hand?
> A: If you study that door and look at it and see what's in that video, focusing on that cable and drum, yes, you can clearly see that. But now, if you are the person out in that shop that hits the door to raise it, and then as it's raising you go by it, and you inadvertently catch your left hand in it or if you trip and get your left hand in it, as you're going to your car, now, you don't realize the potential that that mechanism has. The risk.

[¶42.] The majority finally misapplies the rule that in order for a plaintiff to have assumed the risk, "it [must be] the type of risk that *no adult* of average intelligence can deny." *See Supra* ¶ 13 (citing Duda v. Phatty McGees Inc., 2008 SD 115, ¶ 13, 758 NW2d 754, 758) (emphasis added). Although the majority is correct that the circuit court provided a "standard of care" instruction applicable to juveniles, the instruction related to contributory negligence rather than assumption of the risk. In distinguishing the two defenses, this Court has specifically pointed out that such standards of conduct relate to questions of negligence, but the question in assumption of the risk is "*knowledge* of the danger and intelligent

acquiescence in it." Bartlett v. Gregg, 77 SD 406, 413, 92 NW2d 654, 658 (1958) (emphasis added). Yet in this case, the circuit court's instruction on a juvenile standard of *conduct* did not advise the jury that a fifteen-year-old is not bound by an adult's *mental capacity* and a juvenile must have fully recognized and intelligently acquiesced in assuming the specific risk. As we noted in *Dodson*, a case involving diminished mental capacity, an assumption of the risk instruction should be given only if the trial court determines a plaintiff with less than full mental capacity "possessed full comprehension and appreciation of the danger of injury." Dodson v. S.D. Dep't of Human Serv., 2005 SD 91, ¶ 18, 703 NW2d 353, 360.[4]

[¶43.]     Ultimately, this case is similar to *Thomas v. St. Mary's Roman Catholic Church,* 283 NW2d 254 (SD 1979). There, we observed that "while [the plaintiff] may have assumed certain risks of danger inherent in playing the game of basketball . . . , he did not assume the risk that the glass panel located in such close proximity to the basket would break upon impact." *Id.* at 260. We concluded, "[s]ince knowledge and appreciation of a particular risk are essential to the defense of assumption of risk, a plaintiff must only be held to assume the risk he

---

4.     All of the majority's cited authorities confirm that the circuit court's juvenile standard of care instruction involved cases concerning issues other than assumption of risk. *See Supra* n 1. Those cases involved issues of the existence of a duty or defining the standard of care for negligence, contributory negligence, and willful and wanton conduct. None of the majority's authorities suggest a juvenile standard of care instruction satisfied the court's duty to instruct the jury to assess whether Wangsness possessed the *full mental* comprehension and appreciation of the specific defect and risk that is commensurate with that possessed by an adult.

appreciates, not the risk which he does not." *Id.* (citing Restatement (Second) of Torts § 496c cmt. i (1965)). The same is true with Wangsness. He may have appreciated the nature and risk of opening a large bi-fold door, but there was no evidence he had an adult's appreciation of the specific defect and risk posed by the unshielded drum and cable mechanism. Therefore, the circuit court erred in giving the instruction.

[¶44.]    MEIERHENRY, Justice, joins this special writing.