#28631-a-MES
**2019 S.D. 53**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

GENE WEBER and
CLARISSA WEBER,                                    Plaintiffs and Appellees,

v.

GERALD RAINS and K & L
CONSTRUCTION, INC. d/b/a
K & L LANDSCAPE &
CONSTRUCTION, INC.,                                Defendants and Appellants.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
HANSON COUNTY, SOUTH DAKOTA
* * * *
THE HONORABLE PATRICK T. SMITH
Judge

* * * *

MICHAEL D. BORNITZ
KIMBERLY R. WASSINK
ROBERT D. TRZYNKA
SAMUEL A. KRYSTOSEK of
Cutler Law Firm, LLP
Sioux Falls, South Dakota                          Attorneys for plaintiffs and
                                                   appellees.


ROSS M. WRIGHT
DANA VAN BEEK PALMER of
Lynn, Jackson, Shultz
 & Lebrun, P.C.
Sioux Falls, South Dakota                          Attorneys for defendants and
                                                   appellants.

* * * *

CONSIDERED ON BRIEFS
ON JANUARY 7, 2019
OPINION FILED **09/04/19**

#28631

SALTER, Justice

[¶1.] Gene Weber brought suit against Gerald Rains and K & L Construction (the Appellants) for injuries sustained in a motor vehicle accident. The jury returned a verdict in favor of Weber and awarded damages. On appeal, the Appellants claim the circuit court abused its discretion when it denied their motion to exclude testimony from Weber's medical providers regarding the extent and permanency of his injuries. The Appellants also contend the jury's passion or prejudice resulted in an excessive and unsustainable verdict. We affirm.

## Background

[¶2.] Weber and Rains were involved in a motor vehicle accident on January 9, 2014, on Highway 25 south of Emery. Highway 25 is a two-lane blacktop road with no shoulder. Weber was traveling southbound in his pickup truck, heading back to his job site after stopping home in Emery for lunch.[1] Rains was northbound, driving a semi-tractor with a side dump trailer. He was working within the scope of his employment with Sioux City-based K & L Construction, transporting gravel from a quarry to the site of a bridge maintenance project.

[¶3.] Rains testified that he had a coughing fit just prior to the collision, and an investigation revealed that his tractor-trailer had drifted over the centerline. Both drivers stated they took evasive action and were able to avoid a head-on collision. However, Rains' rear axle struck Weber's front driver's side, causing

---

1. Weber has been self-employed as a carpenter and contractor for over 20 years. His work typically includes installing sheet rock, shingling, cabinet-hanging, and other home improvement projects.

-1-

Weber's pickup truck to spin into the oncoming traffic lane and land in the opposite ditch.

[¶4.] Weber testified that after the accident he was dazed and may have lost consciousness momentarily. After taking a few moments to assess his condition, he got out of his pickup and spoke with Rains and another K & L truck driver who witnessed the accident. Weber stated that he was feeling alright at the accident scene, but he started to experience tightness in his shoulders later that evening.

[¶5.] The following morning, Weber saw his regular medical provider, Joni Wagner (Wagner), a physician assistant, and reported that he felt "beat up." Weber told Wagner he had pain in his shoulders, upper and lower back, and a headache. Wagner prescribed a regimen of physical therapy and referred him to Dr. Matthew McKenzie, an orthopedic surgeon. Weber testified that the physical therapy provided only short-term relief. Dr. McKenzie obtained an MRI, which was "essentially normal." He diagnosed Weber with chronic myofascial pain and suggested chiropractic treatment.

[¶6.] Weber started chiropractic treatment with Dr. John Bosch in the fall of 2014. Eventually, his low back and left shoulder pain subsided, but he continued to experience right shoulder pain and headaches. Dr. Bosch referred Weber to Dr. Jason Hurd, another orthopedic surgeon, who diagnosed his condition as "a myofascial whiplash injury" and suggested nerve conduction studies. When the studies found normal nerve activity, Dr. Hurd advised Weber to continue chiropractic treatment.

[¶7.] Weber also saw Dr. Christopher Janssen, a physiatrist, twice. Dr. Janssen thought Weber was experiencing cervical facet pain and offered Weber trigger-point injections and radiofrequency ablation as treatment options. Weber declined, opting for over-the-counter pain medication and chiropractic treatment.

[¶8.] Weber commenced this action against the Appellants, seeking damages he alleged were caused by Rains' negligence. Prior to trial, the Appellants admitted liability for the collision and agreed to pay for Weber's past medical expenses and property damage. Still unresolved were the issues of Weber's past wage loss,[2] future chiropractic expenses, pain and suffering, and the loss of consortium claim of Weber's wife, Clarissa.

[¶9.] In his responses to the Appellants' discovery requests, Weber initially objected to an interrogatory requesting information about expert witnesses, citing attorney-client privilege and work-product doctrine. However, Weber's response also stated that "[w]ithout waiving this objection, Plaintiff anticipates that his doctors would testify as expert witnesses regarding his care and treatment, his prognosis, and his past and future medical bills."

[¶10.] On October 30, 2017, pursuant to the court's scheduling order, Weber identified Wagner and Drs. Bosch and Janssen as expert witnesses. Weber's disclosures stated they would testify that: (1) the accident caused Weber's injuries; (2) Weber would require future medical care; and (3) Weber's injuries are permanent. The Appellants' deadline to disclose expert witnesses was November

---

2.  Weber's claim only included wages lost while attending medical appointments.

30, 2017, but they chose to not identify any experts. Weber supplemented his discovery responses on January 5, 2018, responding to the Appellants' request for expert witness information by referring to his earlier expert disclosure.

[¶11.] On January 28, 2018, Weber saw Wagner again for the first time in almost three years. The visit occurred just prior to Wagner's trial deposition. Wagner's record of this visit relates how Weber's pain affected his marital relationship and his hobbies, and caused emotional stress from lost wages and medical bills. At her trial deposition, Wagner testified generally that chronic pain can cause depression, anxiety, relationship problems, and other health issues. Wagner also testified that Weber would "more likely than not" continue to experience flare-ups of his chronic pain symptoms. The Appellants contend that Wagner had never mentioned any of these concerns in her records of Weber's prior visits. They also claim that the treatment records of Drs. Bosch and Janssen failed to mention that Weber was permanently injured or could not enjoy his hobbies.

[¶12.] Prior to trial, the Appellants moved the circuit court *in limine* for an order excluding: (1) argument, testimony, or evidence portraying Dr. Bosch, Dr. Janssen, and Wagner as expert witnesses; (2) portions of Wagner's deposition testimony regarding missed work and loss of income, the need to find different employment, and general questions regarding chronic pain; and (3) evidence, testimony, and argument that Weber will have future pain, suffering, and medical expenses. The Appellants argued Weber's expert designations did not comply with the rules of discovery, claiming his patient treatment records did not support the opinions of his medical providers. In the Appellants' initial view, Weber's treating

providers should have been considered lay witnesses who were unable to provide opinions regarding the permanency of Weber's injuries, his future pain and suffering, and his future medical treatment.

[¶13.] On February 20, 2018—the first morning of the three-day trial—the circuit court denied the Appellants' motions to exclude testimony about Weber's future pain and suffering, finding that the challenged testimony was within the scope of Weber's treatment. The court determined that Weber's medical providers could testify about their perceptions of Weber's overall prognosis that they acquired while treating him. In so doing, the court also rejected the Appellants' argument that allowing Wagner to testify generally about how chronic pain can affect a patient would violate the rules of civil procedure governing expert disclosures.

[¶14.] In addition to presenting Wagner's videotaped deposition at trial, Weber also offered live testimony from Drs. Bosch and Janssen. Dr. Bosch testified that Weber experienced difficulty performing his work duties and enjoying his hobbies due to his injuries. Dr. Bosch also testified that he "picked up" on Weber's emotional issues from his injuries, and opined that his pain would "forever be an issue [due to] continuous re-injury, [were] chronic, [and] there's not going to be a drastic change." Dr. Janssen testified that Weber suffered a whiplash injury with resulting cervical facet pain and cervical myofascial pain that would likely be permanent. In Dr. Janssen's view, Weber would never be pain free, and treatment goals were focused on reducing his pain complaints. The Appellants did not offer any expert medical evidence.

[¶15.] The jury awarded Weber $813,480 for pain and suffering, loss of enjoyment of life, mental anguish, and disability. It also awarded Weber $31,000 for future chiropractic care, $35,520 for lost wages, and $20,000 for Clarissa's loss of consortium claim.

[¶16.] The Appellants moved for a new trial, and the record relating to the post-verdict litigation that followed provides some of the most illuminating information relative to this appeal. As their first basis for a new trial, the Appellants argued that the court should not have allowed Wagner to testify about collateral effects associated with chronic pain or allowed Dr. Janssen to testify that Weber's pain was permanent. For each witness, the Appellants asserted that the treatment records failed to support the breadth of their opinions. Weber's counsel countered, stating he did not actually know what his medical providers would say in response to his permanency-related questions because, unlike a retained expert, he was unable to easily visit with them and determine their testimony or the contents of any report. However, Weber's counsel also indicated that he disclosed the medical providers as experts to provide notice and on the strength of his belief that the witnesses would, in fact, testify that the injury was permanent given the length of time Weber had suffered from pain and its unresolved nature.

[¶17.] In a rejoinder, counsel for the Appellants acknowledged that Weber's disclosure "partially complied" with the rules, but they also alleged it "created confusion" because of uncertainty whether the medical providers were testifying as lay or expert witnesses. In response to an inquiry from the circuit court, counsel for the Appellants further acknowledged that Weber's expert witness disclosure plainly

stated that his medical providers would each testify that Weber's injuries were permanent. Counsel for the Appellants stated that they had, nevertheless, elected not to depose any of the medical providers, opting to seek exclusion of their testimony at trial because of what they believed to be an insufficient basis provided by the disclosure.

[¶18.] During the course of the hearing, the parties and the court discussed in detail varying interpretations of our decisions in *Veith v. O'Brien*, 2007 S.D. 88, 739 N.W.2d 15, and *Wangsness v. Builder's Cashway, Inc.*, 2010 S.D. 14, 779 N.W.2d 136. Both opinions express the position that treating medical providers may be considered lay witnesses, rather than expert witnesses, who are not subject to traditional pretrial discovery rules relating to experts. The Appellants had originally viewed Weber's treating medical providers as lay witnesses, but during the new trial litigation they relied upon *Wangsness* to argue that the treating medical providers were experts whose opinions and bases were subject to disclosure under our pretrial discovery rules. Relying upon *Veith*, Weber contended his medical providers were not experts at all, but, in any event, their identities and opinions had been disclosed.

[¶19.] The court ultimately viewed *Veith* as controlling and determined that the treating medical providers did not "fit under the definition of an expert[.]" The court also indicated that any inconsistencies between the medical records and the testimony could have been addressed adequately through cross examination and noted that testimony from other lay witnesses—Weber, as well as his wife, son, and father—supported the assertion that Weber's injuries are permanent.

#28631

[¶20.]     As their second basis for a new trial, the Appellants argued that the verdict was excessive and the product of passion and prejudice.  The circuit court denied the motion, however, under the following reasoning:

> I do not believe simply because the verdict approached a million dollars, that that in and of itself makes it shocking to anyone's conscience.  I believe this verdict was capable of being reached by a jury that heard the facts and interpreted them in the manner in which they did and was not the result of passion or bias or reflective of them being inflamed in any fashion.

[¶21.]     The Appellants raise two issues on appeal, restated as follows:

1. Whether the circuit court abused its discretion by admitting certain testimony from Weber's treating providers.

2. Whether the circuit court abused its discretion by denying the Appellants' motion for a new trial based upon their claim that the verdict was excessive.

## Analysis

### *Medical Expert Discovery*

[¶22.]     "The trial court's evidentiary rulings . . . will not be overturned absent a clear abuse of discretion."  *Veith*, 2007 S.D. 88, ¶ 25, 739 N.W.2d at 23. "A court abuses its discretion when it makes 'a fundamental error of judgment, a choice outside the reasonable range of permissible choices, a decision . . . [that], on full consideration, is arbitrary or unreasonable.'" *ISG, Corp., v. PLE, Inc.*, 2018 S.D. 64, ¶ 24, 917 N.W.2d 23, 32 (alteration in original) (quoting *Wald, Inc. v. Stanley*, 2005 S.D. 112, ¶ 8, 706 N.W.2d 626, 629).  "Our review [of evidentiary rulings] requires a two-step process; first, to determine whether the trial court abused its discretion in making an evidentiary ruling; and second, whether the error was a prejudicial error that 'in all probability' affected the jury's conclusion." *O'Day v. Nanton*, 2017 S.D.

90, ¶ 21, 905 N.W.2d 568, 573 (quoting *Supreme Pork, Inc. v. Master Blaster, Inc.*, 2009 S.D. 20, ¶ 59, 764 N.W.2d 474, 491).

[¶23.]     We also review the grant or denial of a motion for new trial under the abuse of discretion standard.  *See Glanzer v. Reed*, 2008 S.D. 104, ¶ 13, 757 N.W.2d 417, 420 ("Whether a new trial should be granted is left to the sound judicial discretion of the trial court, and this Court will not disturb the trial court's decision absent a clear showing of abuse of discretion." (quoting *Waldner v. Berglund*, 2008 S.D. 75, ¶ 11, 754 N.W.2d 832, 835)).  A motion for a new trial may be granted when an "[i]rregularity in the proceedings . . . prevented . . . a fair trial."  SDCL 15-6-59(a)(1).

[¶24.]     Pretrial discovery relating to expert witnesses is generally governed by SDCL 15-6-26(b), which provides in relevant part:

> A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

SDCL 15-6-26(b)(4)(A)(i).  The provisions of SDCL 15-6-26(e) further impose a continuing obligation upon parties to supplement their earlier responses if they were either incomplete or "if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." SDCL 15-6-26(e)(1)-(2).

[¶25.]     Included among the broad range of sanctions available to circuit judges who determine a party has failed to properly supplement its earlier discovery responses is the express authority to exclude the evidence that was not disclosed.

However, this authority is tempered by the requirement that the court assess the violation for harmlessness:

> A party that without substantial justification fails to disclose information required by subdivision 15-6-26(e)(1), or to amend a prior response to discovery as required by subdivision 15-6-26(e)(2), is not, *unless such failure is harmless*, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed. In addition to or in lieu of this sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions.

SDCL 15-6-37(c)(1) (emphasis added).

[¶26.]        Here, even if Weber failed to seasonably amend or supplement his response to the Appellants' interrogatory seeking expert witness information, Weber did timely disclose Wagner and Drs. Bosch and Janssen as experts pursuant to the court's scheduling order on October 30, 2017.[3]  The three had treated Weber, and the disclosure indicated that the subject matter of their testimony would relate to his "injuries, medical care, treatment and prognosis."  Weber identified the grounds for their opinions as their treatment, along with their "education, training, and experience[.]"  The disclosure also described the substance of the experts' opinions in the following terms:

> Plaintiff Gene Weber's medical providers will testify consistent with the medical records regarding Plaintiff's injuries, medical condition, care, treatment, progress, and prognosis.  They will discuss the injuries Plaintiff Gene Weber sustained, describe the medical basis and cause for those injuries, and otherwise demonstrate how Mr. Weber was injured in this collision.  In addition[,] they will testify that Plaintiff's injuries were proximately caused by the motor vehicle collision, that the Plaintiff will require future medical care as a proximate result of

---

3.      *See* SDCL 15-6-16 (requiring the court to enter a scheduling order establishing certain enumerated deadlines, as well as any deadlines "appropriate to the circumstances of the case").

the motor vehicle collision, and that *Plaintiff's present medical condition is permanent in nature.*

(Emphasis added.)

[¶27.]     Against this legal and factual backdrop, we are unable to accept the Appellants' principal argument that they were "ambushed" at trial with expert medical testimony that Weber's injuries were permanent.  Nor can we safely proceed on the Appellants' view that a discovery violation necessarily occurred and move directly to the prejudice considerations we set out in *Papke v. Harbert*, 2007 S.D. 87, ¶ 55, 738 N.W.2d 510, 529.

[¶28.]     At the latest, Appellants knew on October 30, 2017, that Weber's treating medical providers would testify that, in their respective opinions, Weber's injuries were permanent.  The case was tried to a jury on February 20-22, 2018, leaving the Appellants nearly four months to determine their best course in light of this disclosure.  Under the circumstances, this should have been sufficient time for the Appellants to formulate a plan to meet Weber's proof if they believed that to be necessary.  The Appellants had until November 31, 2017, to disclose their own medical experts, but they did not pursue that option to refute Weber's permanent injury claim.  Nor did they seek additional time from the court to develop their own expert proof.

[¶29.]     The Appellants' principal effort on appeal—to assail the sufficiency of Weber's medical records as a basis to support the expert's opinions concerning permanency—is also not sustainable.  So far as they are included in the record here, Weber's medical records describe chronic pain that was treated but did not resolve. In this regard, the records reveal initial efforts to address Weber's pain through

physical therapy, a lengthy course of chiropractic care, and successive referrals to orthopedic specialists, all without lasting success. Numerous attempts to gain insight from diagnostic studies and imaging were equally unsuccessful, and Weber eventually sought care from Dr. Janssen for pain management. Even if, as the Appellants state, Weber's medical records do not include the word "permanent," permanency is, nevertheless, an apparent and reasonable inference from the records.

[¶30.]       Under the circumstances, therefore, the circuit court did not abuse its discretion by denying the Appellants' motion to exclude the testimony of Weber's treating medical providers. Even if Weber's supplemented interrogatory response was not seasonable, the court acted within the rules of civil procedure to deny the Appellants' motion in limine. In this regard, the duty to supplement contained in SDCL 15-6-26(e)(1) and (e)(2) applies to information "not otherwise . . . made known to the other parties during the discovery process or in writing." Here, Weber's expert disclosure on October 30, 2017, plainly stated that his medical providers would testify that his pain is permanent. Given this, we are unable to determine a violation of the discovery rules occurred or that the exclusionary remedy authorized as a sanction in SDCL 15-6-37(c) is implicated.

[¶31.]       Beyond this, a separate issue pervades the parties' submissions and requires us to clarify the state of our decisional law regarding treating medical witnesses. Both the parties and the circuit court have, understandably, relied upon our prior decisions distinguishing witnesses who are treating medical providers and witnesses whose medical testimony was developed in anticipation of trial. *See*

*Wangsness*, 2010 S.D. 14, ¶ 20, 779 N.W.2d at 142-43; *Veith*, 2007 S.D. 88, ¶¶ 42, 45, 739 N.W.2d at 27-28. According to these decisions, the former are regarded as lay witnesses, testifying about their perceptions even when those perceptions are informed by the application of specialized knowledge, training, and experience. *Id.* Only the latter category of witnesses, under the opinions in *Wangsness* and *Veith*, are considered experts. *Id.*

[¶32.] In *Veith,* we held that a treating physician would be viewed as an "ordinary witness" who could testify about conclusions made in his treatment of the plaintiff even though the physician and his opinions were not disclosed. 2007 S.D. 88, ¶ 45, 739 N.W.2d at 28. We similarly held in *Wangsness* that treating physicians will be treated as lay witnesses for purposes of disclosure under SDCL 15-6-26(b)(4)(A)(i), as long as their opinions are not obtained in anticipation of litigation. 2010 S.D. 14, ¶ 20, 779 N.W.2d at 142-43.

[¶33.] However, the current text of SDCL 19-19-701 no longer supports the view that treating medical witnesses, such as physicians, should be categorically treated as lay witnesses simply because they provide testimony based upon their perceptions. In 2011, we amended SDCL 19-19-701 relating to lay witnesses by unambiguously stating that lay witness testimony may "[n]ot [be] based on scientific, technical or other specialized knowledge within the scope of [SDCL 19-19-702]." SDCL 19-19-701(c).[4] The reference to SDCL 19-19-702 relates, of course, to our rule of evidence concerning expert witnesses. Both SDCL 19-19-701 and SDCL

---

4.    Both *Veith* and *Wangsness* were decided before the 2011 amendment to what is now SDCL 19-19-701.

19-19-702 are modeled after corresponding Federal Rules of Evidence, and, in fact, Rule 701 of the federal rules was, itself, similarly amended in 2000. At the time, the Advisory Committee stated the change was intended to "eliminate the risk that the reliability requirements set forth in Rule 702 would be evaded through the simple expedient of proffering an expert in lay witness clothing." Fed. R. Evid. 701 advisory committee's note to 2000 amendment. The amendment "also ensure[d] that a party will not evade the expert witness disclosure requirements set forth in Fed. R. Civ. P. 26 . . . ." *Id.*

[¶34.] Here, though, the concern about failing to disclose treating medical providers as experts is largely averted because Weber did, in fact, disclose his treating physicians and physician assistant as experts. He did not, in other words, seek to avoid disclosure by "proffering an expert in lay witness clothing." As we stated above, Weber also provided notice that the medical experts would testify that his pain is a permanent condition and that the medical records, detailing chronic pain and ongoing pain management, adequately disclosed the basis for the testimony. However, the medical records describing Weber's pain would not necessarily provide a basis for Wagner's opinions about the collateral impact of Weber's pain, such as anxiety, depression, relationship problems, overuse injuries, and diminished interest in hobbies.

[¶35.] Even assuming, without deciding, that the medical records provided insufficient support for these discrete opinions and that they were otherwise not disclosed, we do not believe reversal is required. We have identified the following

areas of concern to consider when assessing the impact of a party's failure to fully disclose an expert's opinion:

> (1) the time element and whether there was bad faith by the party required to supplement; (2) whether the expert testimony or evidence pertained to a crucial issue; and (3) whether the expert testimony differed substantially from what was disclosed in the discovery process.

*Papke*, 2007 S.D. 87, ¶ 56, 738 N.W.2d at 529 (citing *Kaiser v. Univ. Physicians Clinic*, 2006 S.D. 95, ¶ 35, 724 N.W.2d 186, 195-96).

[¶36.]     Here, the Appellants do not allege Weber acted in bad faith concerning Wagner's opinions. They acknowledge that Wagner's trial testimony was taken by deposition three weeks before trial and not offered unexpectedly at the trial. Although the Appellants argue they had insufficient time to engage their own expert, there is no indication they either tried to engage an expert or asked the court for additional time to allow them to do so. Further, Wagner's testimony about the adverse impact Weber's pain has had or may have upon his life is a closely-related extension of the permanency testimony, which the Appellants identify as the central and crucial issue in this case, and which we have determined was properly disclosed.

[¶37.]     Beyond this, the testimony from Wagner on the collateral effect of Weber's pain was brief—accounting for only a small portion of the entire evidentiary record adduced at trial. Moreover, Wagner's testimony on this topic primarily restated Weber's own allegations about how his life has been impacted by his injuries or illustrated the impacts of his injuries. Furthermore, Weber's counsel

did not refer to these specific undisclosed opinions in his opening statement or closing argument.

[¶38.] Setting Wagner's undisclosed opinions in the context of the entire trial, we are unable to find sufficient prejudice to support the Appellants' request for a new trial. Even if the circuit court abused its discretion in allowing this testimony under what we now conclude were outdated distinctions for treating medical witnesses set out in *Veith* and *Wangsness*, its decision to deny the motion for a new trial was not, itself, an abuse of discretion. Given our assessment of the prejudice resulting from Wagner's undisclosed opinions, the court's decision to deny the Appellants' new trial motion was within the range of permissible choices.

### *Jury Verdict*

[¶39.] Under SDCL 15-6-59(a)(5), a court may grant a motion for a new trial if it finds "[e]xcessive or inadequate damages appearing to have been given under the influence of passion or prejudice[.]" "A motion for a new trial based upon an excessive damages award 'is addressed to the sound discretion of the trial court and a denial of the motion will not be reversed absent an abuse of that discretion[.]'" *Maryott v. First Nat'l Bank of Eden*, 2001 S.D. 43, ¶ 26, 624 N.W.2d 96, 105 (quoting *Berry v. Risdall*, 1998 S.D. 18, ¶ 9, 576 N.W.2d 1, 4).

[¶40.] We have previously stated that "a jury's verdict should not be set aside 'except in extreme cases where it is the result of passion or prejudice[.]'" *Roth v. Farner-Bocken Co.*, 2003 S.D. 80, ¶ 10, 667 N.W.2d 651, 659 (quoting *Biegler v. Am. Family Mut. Ins. Co.*, 2001 S.D. 13, ¶ 32, 621 N.W.2d 592, 601). "A verdict should only be set aside if the jury's conclusion was unreasonable and a clear illustration of

its failure to impartially apply 'the reasoning faculty on the facts before [it].'" *Id.* (quoting *Biegler*, 2001 S.D. 13, ¶ 32, 621 N.W.2d at 601). Additionally, we have held that:

> [w]hen considering whether a jury verdict is sustained by the evidence[,] 'we are not to speculate or query how we would have viewed the evidence and testimony, or what verdict we would have rendered had we been the jury. The real and only question to be solved and answered is [whether] there [is] any legal evidence upon which the verdict can properly be based, and [whether] the conclusions embraced in and covered by [the verdict were] fairly reached . . . .'

*Id.* ¶ 25, 667 N.W.2d at 661 (quoting *Biegler*, 2001 S.D. 13, ¶ 32, 621 N.W.2d at 602). "The test for determining if the jury verdict is the product of passion or prejudice is . . . 'damages . . . so excessive as to strike [society], at first blush, as being, beyond all measure, unreasonable and outrageous . . . .'" *Id.* ¶ 26 (quoting *Stormo v. Strong*, 469 N.W.2d 816, 826 (S.D. 1991)).

[¶41.] Here, the Appellants claim the jury was prejudiced by Weber's treating medical providers' "improperly admitted" testimony regarding the permanency of his injuries. However, this is simply a restated version of the expert testimony argument we addressed in our analysis above.

[¶42.] The Appellants further contend that "gross disparity between the nature of [Weber's] injury and the award for pain and suffering leads to the inescapable conclusion that the jury was moved by passion or prejudice." Like the circuit court, we are not convinced that the verdict, alone, is self-evident proof of passion or prejudice. While the jury's award for Weber's pain and suffering was significantly higher than its award for the other claims, we find it is supported by the testimony of his treating medical providers and other witnesses at trial. His

medical providers universally agreed that his injuries are permanent, and he will experience flare-ups of pain regardless of his choice of work and hobbies for the rest of his life. Weber was 44 years old at the time of trial, and the court instructed the jury that he had an actuarially-based life expectancy of 37.5 additional years. His family provided significant testimony of Weber's lifestyle changes, including irritability, lack of motivation, and fatigue that they attributed to dealing with pain. Our review of the evidence presented to the jury shows there was sufficient evidence to support its award for Weber's pain and suffering and fails to support the claim that the jury acted with passion or prejudice.

[¶43.] Indeed, the most conspicuous feature of this evidentiary record is that it is decidedly one-sided. Though the Appellants dispute the testimony from Weber's medical providers regarding the extent and permanency of his injuries, they did not engage their own expert witnesses to provide an evidentiary basis for a contrary conclusion. They also suggest that the verdict is unsustainable because it is merely a "soft tissue injury" that Weber treated with over-the-counter pain relievers. However, the Appellants' observations—offered as legal arguments—are unconnected to actual medical evidence supporting their argument that Weber's soft-tissue injuries are not painful and permanent.

[¶44.] Finally, we are not persuaded by the Appellants' argument that the passion of the jury was aroused, at least in part, because the trial was conducted in Weber's home county and Dr. Janssen's hometown. The Appellants did not cite these circumstances to support their new trial motion before the circuit court, but even if the claims were preserved, we cannot accept the argument. We believe the

Appellants were in the best position to assess these conditions before proceeding to trial, rather than asking this Court to consider this argument after the verdict.

## Conclusion

[¶45.]     The circuit court did not abuse its discretion when it allowed Weber's treating providers to testify about the permanency of his injuries, and its decision to allow Wagner's undisclosed opinions about the impact of Weber's injuries did not create prejudice sufficient to warrant reversal.  Further, our review of the evidence presented to the jury supports its verdict, which we hold was not the result of passion or prejudice.  Therefore, the circuit court did not abuse its discretion when it denied the Appellants' motion for a new trial.  We affirm.

[¶46.]     GILBERTSON, Chief Justice, and KERN and JENSEN, Justices, and SEVERSON, Retired Justice, concur.